890 F.Supp. 1143 (1995)
NATIONAL EDUCATION ASSOCIATION-RHODE ISLAND, BY its Secretary, Tia SCIGULINSKY, Rhode Island Federation of Teachers, by its Secretary, Coleen Bielecki, John Callaci, Diana Casey, Edward Casey, Jr., Robert Casey, Bernard Connerton, Ronald Diorio, Denise Felice, Joseph Grande, Gloria Heisler, Karen Comiskey Jenkins, Robert Joy, Janice Lanik, Charlene Lee, Cornelius McAuliffe, Edward McElroy, Harvey Press, Vincent Santaniello, Joan Silva, Bernard Singleton, Diane Thurber, and Jeannette Wooley, Plaintiffs,
v.
RETIREMENT BOARD OF the RHODE ISLAND EMPLOYEES' RETIREMENT SYSTEM, Nancy Mayer, Chairperson and Treasurer of the Retirement Board of the Rhode Island Employees' Retirement System in her official capacity, and Joann Flaminio, Executive Director of the Retirement Board of the Rhode Island Employees' Retirement System in her official capacity, Defendants.
Civ. A. No. 94-0389L.
United States District Court, D. Rhode Island.
July 7, 1995.
*1144 *1145 *1146 *1147 Robert H. Chanin, Caroline Frederickson, Bredhoff & Kaiser, Washington, DC, Thomas J. Liguori, Jr., Urso, Liguori & Urso, Westerly, RI, and Richard A. Skolnik, Skolnik, McIntyre & Tate, Ltd., Providence, RI, for plaintiffs.
Alan M. Shoer, State of R.I. Atty. General's Dept., Providence, RI, and William S. Eggeling, and Joan McPhee, Ropes & Gray, Providence, RI, for defendants.

MEMORANDUM AND ORDER
LAGUEUX, Chief Judge.
This matter is before the Court on two identical motions to dismiss under Rule 12(b)(6). The first motion was filed by Defendant Nancy Mayer ("Mayer"), in her official capacity as Chairperson and Treasurer of the Retirement Board of the Rhode Island Employees' Retirement System ("Retirement Board"). The second motion was filed by Defendants Retirement Board and Joann Flaminio ("Flaminio"), in her official capacity as Executive Director of the Retirement Board. Defendants' motions[1] assert that plaintiffs' Complaint, challenging the constitutionality of R.I.Gen.Laws § 36-9.1-2, fails to state any legal claims for relief. For the following reasons, defendants' motions are denied.

I. Undisputed Background Facts
On July 3, 1987, the Rhode Island General Assembly enacted a statute that allowed individuals who were or had been "full-time employees of organizations representing employees of the state and/or any political subdivisions thereof for the purposes of collective bargaining" to acquire certain benefits under the Rhode Island Employees' Retirement System ("Retirement System" or "System"). That statute, R.I.Gen.Laws § 36-9-33, stated:
(a) The provisions of chapters 8 through 10 of this title, inclusive, [which establish the terms of the Retirement System,] shall apply to full-time employees or organizations representing employees of the state and/or any political subdivisions thereof for *1148 the purposes of collective bargaining; provided, that any such organization must elect to be covered by the provisions of chapters 8 through 10 of this title by forwarding a certified vote of the organization's appropriate authority to the retirement board not later than December 31, 1988; and provided further, that participation shall not begin later than July 1, 1989. The organization's contribution shall be at the same rate as the contribution of a local education agency for certified teachers. All employees in service as of the date of said certified vote shall become members unless they notify the retirement board, in writing, within sixty (60) days from the date of said certified vote, that they do not wish to become members.
(b) Any member of the state employees' retirement system or any full-time employee of an organization representing employees of the state and/or any political subdivision thereof for the purposes of collective bargaining, who has prior hereto been a full-time employee of such an organization or who has been employed by any public school district in-state or out-of-state, may purchase credit for such employment. The cost to purchase said credits shall be ten percent (10%) of the employee's first year's earnings as a full time employee of such an organization multiplied by the number of years, and any fraction thereof, of such employment. Provided further, that any such employee who has an official leave of absence from such organization shall be eligible to purchase credits as hereinbefore provided for the period of such leave of absence.
Pursuant to § 36-9-33(a), plaintiffs National Education Association-Rhode Island ("NEARI") and Rhode Island Federation of Teachers ("RIFT") elected to be covered by the Retirement System. After this election, certain union employees, now the individual plaintiffs in this action, filed applications with the Retirement Board. The Retirement Board is the administrative body that operates the Retirement System.
On June 6, 1988, while the individual plaintiffs' applications were pending before the Retirement Board, the Rhode Island General Assembly repealed § 36-9-33. Pub.L.1988, ch. 486 (hereinafter "Repeal Statute"). After passage of the Repeal Statute, the Retirement Board refused to allow the individual plaintiffs to become members of, to accrue future service credits in, or to purchase additional service credits from the Retirement System. Their option to join the system had been rescinded.
On October 20, 1988, NEA-RI, RIFT and other organizational and individual plaintiffs brought suit against the Retirement System and the Executive Director of the Retirement Board in Rhode Island Superior Court. The plaintiffs in that case sought an order directing the defendants to "grant the applications [of the individual plaintiffs] ... and comply with the provisions of Section 36-9-33 [with respect to the individual plaintiffs]." The question before the Superior Court was one of statutory interpretation, i.e., whether the Repeal Statute had a retroactive, as well as prospective, effect. If the Repeal Statute operated both prospectively and retroactively, then plaintiffs could not become part of the Retirement System.
On December 11, 1989, a judge of the Rhode Island Superior Court issued an order granting the relief requested by the plaintiffs. He found that the individual plaintiffs, who had filed their applications with the Retirement Board during the approximately 11-month period in which § 36-9-33 was in effect, had satisfied the eligibility requirements of § 36-9-33 and were, therefore, entitled to participate in the Retirement System. He also concluded that the repeal of § 36-9-33 operated prospectively only, and that the plaintiffs were unaffected by its repeal.
On April 23, 1990, the same Superior Court judge issued a further opinion in the same case, in response to a Petition for Clarification and/or Instructions by both sides. He held that the individual plaintiffs "shall be treated as becoming members of the Retirement System as of ... January 1, 1990." For reasons unknown, neither of these decisions of the Superior Court was appealed to the Rhode Island Supreme Court.
Since the orders of the Superior Court became final because of a failure to appeal, the Retirement Board granted the applications *1149 that had been filed by the individual plaintiffs. Per the order of the Superior Court, the individual plaintiffs became members of the Retirement System on January 1, 1990. On that date, the individual plaintiffs began accruing future service credits in and/or received additional service credits in the Retirement System. In addition, the individual plaintiffs either began or continued to contribute 7.5% of their salaries to the Retirement System.
Also on January 1, 1990, NEA-RI and RIFT and its affiliates became employers in the Retirement System. They, too, were required from that day forward to contribute to the Retirement System on behalf of the individual plaintiffs at the same rate as did the local school committees on behalf of their certified teachers. See R.I.Gen.Laws § 36-9-33(a). In addition, some of the plaintiffs purchased past service credits in the system by paying the amount prescribed in the statute. See R.I.Gen.Laws § 36-9-33(b).
Plaintiffs allege in their Complaint that many of them relied on their entry into the Retirement System and future receipt of state pension benefits in making important decisions in their lives. For example, many based employment choices and decisions about savings for their retirement years on their participation in the System. Specifically, plaintiffs contend that: (1) certain individual plaintiffs who had taken temporary leaves of absence from their employment with public school districts to work as full-time employees of NEA-RI or RIFT decided not to return to their school districts, thereby relinquishing their right to continue to participate in the Retirement System as teachers; (2) some individual plaintiffs decided to remain in the employ of NEA-RI or RIFT, and not pursue other employment opportunities; and (3) seven of the individual plaintiffs elected to retire in order to receive the retirement benefits to which they became entitled under the Retirement System, including the benefits acquired pursuant to Section 36-9-33, and others have made plans and commitments in anticipation of receiving such retirement benefits. Complaint, ¶ 18.
During the 1994 Session of the Rhode Island General Assembly, two identical bills, entitled "An Act Relating to Public Officers and Employees  Evicting Non-Employee and Non-Teacher Members from the Retirement System," were introduced into the Rhode Island Senate and House at the request of defendant Mayer, who is General Treasurer of the State of Rhode Island. As indicated in explanatory language that accompanied the bills themselves, their purpose was to retroactively extinguish or reduce retirement benefits of the individual plaintiffs by "evict[ing] ... from the retirement systems ... individuals who were permitted to join or purchase credits, through special pension legislation passed in 1987 [i.e., Section 36-9-33] and repealed in 1988."
The Rhode Island General Assembly enacted the bills on July 15, 1994. R.I.Gen. Laws §§ 36-9.1-1 to -2 (hereinafter "Eviction Act"). The Eviction Act provides in full as follows:
36-9.1-1. Findings.
The General Assembly hereby finds the following: The grant of the opportunity to an individual to purchase, pursuant to Chapter 613 of The Public Laws of 1987, as codified in § 36-9-33 (repealed by PL 88-486), (hereinafter "§ 36-9-33, repealed"), credit in, and/or to become a member of the Retirement Systems established under chapter 16 of Title 16, chapter 21 of title 45, and/or chapters 8-10, inclusive of this title ("Retirement Systems") bears no rational relationship to any legitimate governmental purpose. The continued accrual of benefits by the beneficiaries of § 36-9-33 (repealed) and the continued payment of monies under § 36-9-33 (repealed) will cause an invasion of the corpus of the Retirement Systems funds in abrogation of those sections of the Internal Revenue Code of 1986 as amended from time to time which apply to governmental plans (including but not limited to 401(a) and 401(f)), and does not further the purposes behind the Retirement Systems.
36-9.1-2. Status of non-employee and non-teachers members.
(a) Any individual who became a member of the Retirement Systems based solely on § 36-9-33 (repealed), or who purchased credit in the Retirement Systems based *1150 upon § 36-9-33 (repealed), shall no longer be entitled to such membership and/or such credit(s) and shall no longer receive any benefits of any type from said Retirement Systems which was based upon § 36-9-33 (repealed). By January 1, 1995, the Retirement System shall return any contributions or purchases made pursuant to § 36-9-33 (repealed) by said individual and/or said individual's employer, with interest at the actuarially assumed rate earned by the Retirement Systems on its pension funds during the applicable time period since such contributions and/or purchase was made.
(b) Said return of such contributions or purchases shall be offset by any benefits already received by said individual from the retirement system.
(c) Nothing in this chapter shall be construed as prohibiting any individual from later becoming a member of the Retirement Systems or purchasing credits, in accordance with the applicable law.
R.I.Gen.Laws §§ 36-9.1-1 to -2 (1994 Supplement).
Not long after the passage of the Eviction Act, plaintiffs filed suit in this Court. Plaintiffs contend that the Eviction Act violates three provisions of the United States Constitution. First, plaintiffs allege that the Act impairs plaintiffs' contractual rights in violation of the Contract Clause. U.S. Const. Art. I, § 10. Second, plaintiffs aver that the Act deprives plaintiffs of property without due process of law, in contravention of the Fourteenth Amendment. U.S. Const. amend. XIV. Finally, plaintiffs posit that the Act constitutes a taking of plaintiffs' private property without just compensation, in contravention of the Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment. U.S. Const. amend. V. See Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). Defendants' motions to dismiss contest the validity of each of these causes of action as a matter of law.
After hearing oral argument on the joint motions to dismiss, the Court took this matter under advisement. In the interim, plaintiffs filed a motion for preliminary injunction. The aim of the injunction was to prevent the state from refunding plaintiffs' contributions to the Retirement System, which, according to the Eviction Act, was to occur on January 1, 1995. The Court granted that motion. Therefore, no refund will occur pending the outcome of this case on its merits. At this point, the defendants' motions to dismiss are in order for decision.

II. Standard of Review
To decide a motion to dismiss under Rule 12(b)(6), a court must accept all allegations in the plaintiffs' complaint as true. In Re Ballard Shipping Co., 810 F.Supp. 359, 361 (D.R.I.1993), aff'd in part, rev'd in part, 32 F.3d 623 (1st Cir.1994). A court should only grant a motion to dismiss under 12(b)(6) if plaintiffs cannot prove any set of facts in support of their claims that would entitle them to relief. Rockwell v. Cape Cod Hospital, 26 F.3d 254, 255 (1st Cir.1994); Morgan v. Ellerthorpe, 785 F.Supp. 295, 299 (D.R.I.1992). To be successful on their motion in this case, defendants have the burden of showing that the plaintiffs' claims are insufficient as a matter of law. National Credit Union Admin. Bd. v. Regine, 795 F.Supp. 59, 62 (D.R.I.1992). The question before this Court, therefore, is whether the Complaint, viewed in the light most favorable to plaintiffs and with every doubt resolved on their behalf, states any valid claim for relief. 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (1990).

III. Analysis

A. The Contract Clause
Plaintiffs' first cause of action proceeds under the Contract Clause and 42 U.S.C. § 1983. Plaintiffs claim that before the enactment of the Eviction Act in 1994, they were party to a contract with the Retirement System.[2] By removing both the individual plaintiffs (as members) and NEA-RI and *1151 RIFT (as employers) from the Retirement System, the Eviction Act, in plaintiffs' view, substantially impairs those contractual rights in violation of the Contract Clause. Defendants have moved to dismiss plaintiffs' first claim, arguing that § 36-9-33 does not create a contract as a matter of law and that, as a consequence, plaintiffs have not stated any actionable claim.
The Contract Clause reads: "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10. Originally, the Contract Clause was intended to "protect private contracts from improvident majoritarian impairment." Laurence Tribe, American Constitutional Law § 9-8, at 613 (1988) (emphasis added). However, since its first interpretation by the Supreme Court in Fletcher v. Peck, 10 U.S. (6 Cranch.) 87, 3 L.Ed. 162 (1810), the Contract Clause has been interpreted to apply to legislative impairments of "public" contracts, or contracts to which the state or its agent is a party. Therefore, plaintiffs' Contract Clause claim, which alleges the impairment of a contract between plaintiffs and the Retirement System, is properly before this Court. That the Retirement Board is a state agency is not problematic to plaintiffs' Contract Clause claim.
In determining whether a state law violates the Contract Clause, a court must perform a three-part analysis. First, the Court must decide whether the challenged law infringes a right that arises from a contract or a "contractual agreement." National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985); Dodge v. Board of Education, 302 U.S. 74, 79, 58 S.Ct. 98, 100-01, 82 L.Ed. 57 (1937). If a contractual right has been impaired, the Court must next determine whether that impairment has been substantial. If the impairment is not significant, the Court's inquiry ends. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). If, however, the impairment is substantial, the Court must determine whether the impairment is "reasonable and necessary to serve an important public purpose." United States Trust Co. v. New Jersey, 431 U.S. 1, 25, 97 S.Ct. 1505, 1520, 52 L.Ed.2d 92 (1977). If the statute is neither reasonable nor necessary to serve an important public purpose, then the statute is unconstitutional. The test is one of intermediate scrutiny.

1. The Existence of a Contract
At this point, it is important to clarify the question that is before the Court. The question is whether plaintiffs have sufficiently alleged that, at the time that the Eviction Act was passed, they were party to a contract with the Retirement System as a matter of federal constitutional law. Nevada Employees Assoc., Inc. v. Keating, 903 F.2d 1223, 1227 (9th Cir.1990). The alleged contract between the plaintiffs and the Retirement System arises out of Chapters 8 through 10 of Title 36 of Rhode Island General Laws, the legislative scheme that governs the Retirement System.[3]
This Court notes that there is a strong presumption against interpreting statutes as contractual agreements. National R.R. Passenger Corp., 470 U.S. at 465-66, 105 S.Ct. at 1451-52; Hoffman v. City of Warwick, 909 F.2d 608 (1st Cir.1990). Normally, state statutory enactments do not of their own force create a contract with those whom the statute benefits. Hoffman, 909 F.2d at 614. However, that presumption can be overcome if the language of the statute and other indicia show that the legislature intended to bind itself contractually. State of Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938); Brennan v. Kirby, 529 A.2d 633 (R.I.1987). This is no small hurdle to vault. The party asserting the creation of a statutory contract must prove that the legislation is "intended *1152 to create private contractual or vested rights" and not merely declaratory of "a policy to be pursued until the legislature ... ordains otherwise." National R.R. Passenger Corp., 470 U.S. at 466, 105 S.Ct. at 1451.
Paramount among the indicators to be examined when determining whether a statute constitutes a contractual offer is the language of the statute itself. Dodge, 302 U.S. at 78, 58 S.Ct. at 100. If the language of the statute expressly indicates that the statute is being enacted to form a contract, see, e.g., Mass.Gen.Laws c. 32 § 25 (establishing "membership in the retirement system as a contractual relationship under which members are entitled to contractual rights and benefits"), a determination that the state is party to a binding obligation is clear. Short of an express indication, however, the language of the statute must adequately express actual intent on the part of the state to bind itself in order for the statute to be considered a contract. National R.R. Passenger Corp., 470 U.S. at 466-67, 105 S.Ct. at 1451-52. Both the words of the statute and their effect must be examined. United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977); Brennan v. Kirby, 529 A.2d 633, 637 (R.I.1987).
A close examination of the language of Chapters 8 through 10 of Title 36 does not compel the conclusion that plaintiffs are party to an express legislative contract, though neither does it preclude it. Although at no point do the words "contract," "consideration," "reliance," "offer," or "acceptance" appear, certain sections are expressed in terms of mutual obligations, duties and rights. For example, Section 36-10-9(c) provides that "a person who has ten (10) years of service credit on or before June 16, 1991 shall be vested." Whether statutorily-defined vesting rises to the level of a contract is unclear, though it does suggest some right or interest. Section 36-10-8, concerning the refund of contributions for members who withdraw from public service or who cease to participate in the System for any other reason than death or retirement, reads "[a]ny member receiving a refund shall thereby forfeit and relinquish all accrued rights as a member of the system...." These so-called "rights as members of the system" may or may not be contractual.
Section 36-10-7 reads in part:
[I]t is the intention of the state to make payment of the annuities, benefits, and retirement allowances provided for under the provisions of this chapter and to that end that it is the intention of the state to make the appropriations required by the state to meet its obligations to the extent provided in this chapter. The general assembly shall make annual appropriations which shall be sufficient to provide for the payment of the annuities, benefits, and retirement allowances required of the state under this chapter.
R.I.Gen.Laws § 36-10-7. Whether this "intention" rises to the level of a contract is also unclear. Finally, the strongest evidence of contract may come from Section 36-10-1, which refers to the amount that participants in the Retirement System must contribute. It speaks in terms of how much individuals "shall" pay and states that "[e]very member shall be deemed to consent and agree" to contributory deductions to be taken from his or her paycheck. Thus, when viewed collectively, the precise language of the Retirement System is indefinite, and both sides make some reasonable arguments as to the best interpretation. Read one way, they suggest a contract; read another, they merely express an intention to act.
It is clear, however, that this Court is not limited to an examination of statutory language when it determines whether a statute amounts to a contract. Hoffman, 909 F.2d at 614 (citing U.S. Trust, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977)). "[A] statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." United States Trust, 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14 (emphasis added). In other words, if plaintiffs have sufficiently alleged that the language and the circumstances of this statute amount to an implied contract, their case must be allowed to proceed. If such a contractual relationship does exist, the terms of *1153 the agreement will be contained in the statutes creating the Retirement System.
In order to determine whether plaintiffs are party to an implied contract with the state, this Court will consider three factors. First, this Court will consider the manner in which other courts have treated state pension systems. This information will reflect the current legal climate for understanding pension systems and provide some insight into the legislative intent motivating these enactments. Second, this Court will consider any relevant Rhode Island law on this issue. Clearly, Rhode Island law explaining the effect of the State's pension system will contribute to an understanding of the effect of the legislation on both the State and the plaintiffs. Finally, in light of that discussion, this Court will apply the law of contracts to the enactments in this case, and take into account any relevant equitable considerations.

a. Legal Background of Public Pension Systems
Over the last century, courts have heard a variety of challenges to legislative modifications to pension systems in which plaintiffs have claimed that a pension system constitutes a contract between themselves and the state.[4] In response to these claims, courts have developed a spectrum of models within which a pension system can be categorized. At one end of the spectrum lies the gratuity model. Under the gratuity model, workers have no rights in their expected pensions. Pensions are considered a gift from the state, and the pension benefits can be revoked or modified at any time. At the other end of the spectrum lies the contract model. Under the contract model, workers have contractual interests in their pensions. While the amount of protection varies from state to state (from near absolute protection to hardly any at all), workers may still bring challenges to state action alleging the unilateral impairment of a contract. Between the gratuity model and the contract model are models of implied contractual rights. Here, too, the level of protection for a participant differs from state to state, and the interpretive principles from which these models are derived are varied.
The gratuity view originated in the case of Pennie v. Reis, 132 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426 (1889). In that case, the Supreme Court upheld state legislation repealing a $1,000 death benefit payable from California's public pension system. The Court held that the state employees had no vested interest in receiving the benefit, basing its holding on both the compulsory nature of the system and on the fact that contributing public employees had money withheld from their paychecks, rather than paying directly from their pockets. The Court also rejected the argument that the state had created a contract to continue the benefit perpetually.
The gratuity model was born during a time when pensions were considered a gift from the state, when employees did not contribute to the system, and when pension benefits were insignificant in amount. See W. Greenaugh & F. King, Pension Plans and Public Policy, at 27-62. The gratuity model was therefore developed from the perspective of state legislatures, who worried about the financial burdens of providing pensions. By labelling the pension system a gratuity, courts freed the legislatures to make unilateral modifications to those systems without Contract Clause or common law contract consequences. Since employees did not contribute to the system, they lost nothing except the "insignificant," "free" pension that they would have otherwise received.
The ideological opposite of the gratuity model is the pure contract model. A good example of this model is the Arizona Supreme Court's decision in Yeazell v. Copins, 98 Ariz. 109, 402 P.2d 541 (1965). In that case, the Court allowed a police officer who had requested that his benefits be calculated pursuant to a repealed statute to prevail. The Court held that since the original statute had been part of the retirement system at the time the officer had accepted employment, he was entitled to take advantage of its terms. According to the Court, the police *1154 officer's rights in the pension vested at the time that he began his employment. Any subsequent changes to the pension system were inappropriate unilateral modifications to the contract between the officer and the state.
Unlike the gratuity model, the contract model was developed from the perspective of state employees. It preserves the expectations of employees who make career decisions, retirement savings, and life plans in relation to the receipt of state pensions. In addition, the contract model reflects the principle of exchange. Either employee contributions are interpreted as money given to purchase retirement credits or, alternatively, the pension is seen as deferred compensation for lifetime work for the state at a lower wage. When a pension system is labelled contractual, both the Contract Clause and the common law of contracts may be used to prevent certain unilateral modifications to it.
In between the two ends of the spectrum are models of implied rights. These models cannot be neatly categorized, as the legal reasoning with which contracts are implied and the subsequent protections those implied contracts are given vary from state to state. Therefore, two different examples of models will serve to highlight some portion of this middle area of the spectrum.
The traditional, implied in law contract model was developed in 1917 by the California Supreme Court in O'Dea v. Cook, 176 Cal. 659, 169 P. 366 (1917). According to the California model, employees acquire limited contractual rights at the time that they enter the pension system. The rights are then granted full protection when the employees retire. Before then, the government may make only reasonable modifications to the pension system. In later cases, California has held that "reasonable modifications to the pension system" require some material relation to the purpose of the pension system and an "offsetting advantage" when these systemic changes are detrimental to an employee. Allen v. City of Long Beach, 45 Cal.2d 128, 287 P.2d 765 (1955).
The Supreme Court of Minnesota has developed a unique, implied in law model that is based on principles of promissory estoppel. In Christensen v. Minneapolis Municipal Employees Retirement Board, 331 N.W.2d 740 (Minn.1983), the Court prevented the retirement board from enforcing an amended pension statute that changed the minimum retirement age for a retired employee. The Court expressly rejected the theory that a pension was a gratuity of the state and that the state could therefore make unilateral changes to the system without consideration of the effect on the employees. Instead, the Court held that the statutory pension system amounted to a promise that the state made to its employees. This promise was enforceable through principles of promissory estoppel, as the employees foreseeably relied on it to their detriment. As the Court said, "[i]n the realities of the modern employment marketplace, the state reasonably expects its promise of a retirement program to induce persons to accept and remain in public employment, and persons are so induced, and injustice can be avoided only by enforcement of that promise." 331 N.W.2d at 747. No other state uses the promissory estoppel model.
Regardless of the actual version used, the purpose of the implied rights model is to try to achieve a balance between the rights of the state and the employees. Clearly, an employee has an expectation of receiving a pension and makes many of life's decisions based on the security of receiving a pension. The right to receive a pension should, therefore, be protected. It is equally clear, however, that a state may, from time to time, incur significant financial obligations, and a pension system's fiscal integrity may well be at stake. The state, therefore, may seek to rearrange its obligations to avoid the pension system's collapse.
The implied rights model recognizes these two valid concerns. On one hand, a state legislature should be allowed to make changes to modernize the pension system without having a Contract Clause or breach of contract lawsuit filed each time it so acts. On the other hand, by recognizing the employees' rights and reasonable expectations in receiving their pensions, this model only allows reasonable legislative modifications, which are those that do not unfairly damage *1155 particular employees in order to achieve a generalized financial benefit to the system.
The prevailing view nationally, as a matter of state law, is to reject both the gratuity and the inflexible contract models in favor of others that lie somewhere toward the center of the spectrum. See, e.g., Note, Public Employee Pensions in Times of Fiscal Distress, 90 Harv.L.Rev. 992, 994-98 (1977) (criticizing the gratuity approach). The rationale for the adoption of some form of implied contractual approach, however, is not monolithic. See Andrew C. Mackenzie, Note, Spiller v. State: Determining the Nature of Public Employees' Rights to Their Pensions, 46 Me.L.Rev. 355, 359 (1994). At least six states rely on their constitutions, see, e.g., N.Y. Const. art. V., others rely on the direct language of state statutes themselves, see, e.g., Mass.Gen.Laws c. 32 § 25, and still others have relied on their courts to interpret statutes. Although no clear consensus has developed as to which of the models achieves the best balance, it is clear that some sort of compromise between the interests of the state and the expectations of employees is appropriate. The models that stand at the ends of the spectrum no longer reflect the modern understanding of pension systems.
Within each portion of the spectrum (gratuity, implied contract or contract), there are further variations which distinguish the law from state to state. For instance, one major difference is when an employee's pension rights vest. Some courts hold that a pension right is completely vested once the employment contract is signed and the employee begins to work. In those states, the employee may take legal action immediately with respect to his or her express or implied contract to receive a pension. See, e.g., Leonard v. City of Seattle, 81 Wash.2d 479, 503 P.2d 741 (1972). Other courts hold that the employee's rights only vest when he or she has satisfied the eligibility requirements to receive the pension. Those employees must therefore wait until their rights mature to assert them. See, e.g., Wright v. Allegheny County Retirement Board, 390 Pa. 75, 134 A.2d 231 (1957). Beyond vesting differences, another fundamental question  the amount of protection that employees receive  varies within the different contract models from near absolute to very little. Cf. Yeazell v. Copins, 98 Ariz. 109, 402 P.2d 541 (1965) with City of Dallas v. Trammell, 129 Tex. 150, 101 S.W.2d 1009 (1937).
To some extent, these additional differences between contract models are also designed to balance the competing policy considerations that have compelled the courts to develop the contractual spectrum. By restricting the times during which the employees can assert their rights, or by limiting the relief that accompany a strict contract violation, courts have sought to fine tune the balance between the competing interests of employees and of the state in managing the pension system.

b. Rhode Island Law
The Rhode Island Supreme Court has acknowledged these competing policy considerations and the spectrum of pension models that has consequently developed. However, the Court has refrained from precisely categorizing its public pension system at any one point on that spectrum. The closest that it has come was in In Re Almeida, 611 A.2d 1375 (R.I.1992) (hereinafter Almeida). In that case, the Rhode Island Supreme Court reviewed a petition of Antonio S. Almeida, a retired Justice of the Rhode Island Superior Court. Almeida had petitioned that the Court reject the disciplinary recommendation of the Commission on Judicial Tenure and Discipline, who had found Almeida guilty of illegal and unethical conduct. The Commission had recommended that he be removed from office and that his pension benefits be terminated retroactively to the date of his retirement. Almeida did not contest the recommendation that he should be removed from office, but he argued that termination of his statutorily awarded pension was beyond the power of the Court.
The Court disagreed. In terminating Almeida's pension benefits, the Court noted that honorable and faithful service to the state was essentially a condition precedent to any state employee receiving a pension. Since Almeida had failed to serve honorably, he was disqualified from receiving a pension, even though he had otherwise satisfied the statutory requirements for his pension rights *1156 to vest. In reaching this outcome, the Court noted its reluctance to place the pension system in any one of the previously discussed categories "because such a limiting categorization might lead to an improper consequence." Id., at 1386.
Though the Almeida Court did not expressly anchor the pension system upon the spectrum, the Court did make clear that, as a matter of Rhode Island law, pensions are not gratuities of the state. Id., at 1385 ("Although the pension plan in the present case is noncontributory, we decline to categorize it as a gratuity of the state."). Rather, the Court noted that "we conclude that a pension comprises elements of both the deferred compensation and contract theories." Id., at 1386. In the context of the Almeida opinion, both the "deferred compensation" and "contract" theory are, in fact, theories of implied contract. Indeed, the only difference between the deferred compensation and contract theories is the time at which pension rights vest. According to the contract theory, pension rights vest upon the start of employment. Under the deferred compensation model, pension rights vest upon the satisfaction of statutory eligibility requirements. Either way, the employee has some contractual rights in receiving a pension.
Therefore, the real question that was avoided by the Rhode Island Supreme Court was not whether the pension system was contractual or gratuitous, but instead when participants may assert contractual rights in their pension benefits. Of course, the answer to that question has far-reaching effects, and the Court thus sought to avoid cementing the retirement system into a particular compartment. Yet, notwithstanding the Rhode Island Supreme Court's choice not to categorize the pension system explicitly, this Court concludes that the Almeida decision strongly supports the notion that state pensions are implied contracts, though the time at which the contractual rights may be asserted remains unresolved.
In any event, the Almeida decision does not control here; it merely provides background. The issue of whether a contract exists between the plaintiffs and the Retirement System under the Contract Clause is a matter of federal law. Dodge, 302 U.S. at 78, 58 S.Ct. at 100. Rhode Island law need only be consulted in making this determination. Id. Moreover, Almeida can be distinguished on its facts. The primary distinction is that the pension system in that case was non-contributory.[5] It can also be distinguished because that case concerned the termination of a single person's pension rights for cause, whereas this case concerns the statutory expulsion of a class of persons from the Retirement System who have not been found guilty of wrongdoing.

c. Application of Contract Law
Having established the legal background regarding public pension systems, this Court must now consider whether a contract arose between the plaintiffs and the State when they were allowed into the Retirement System. This Court now holds that an implied in fact contract was created for three reasons. These reasons are ultimately grounded in an assessment of the language and circumstances of the statutes in question.
The first reason is that Section 36-9-33 was an offer to join the Retirement System voluntarily. As such, the statute could not be implemented without the affirmative agreement of the plaintiffs. The statute does not allow plaintiffs to exist statically and have a mandatory gift conferred upon them. Rather, they were required to take action, i.e. to persuade their employers and co-workers to vote to adopt the System and to contribute their money, in order to participate. To that extent, the statute did not offer a guaranteed position in the System, nor did it declare a policy.
The second reason that plaintiffs are party to a contract with the System is that Section 36-9-33 (and Chapters 8 through 10 of Title 36) require that plaintiffs contribute their money in order to participate in the System. Indeed, the only reason that the plaintiffs gave their money to the Retirement System was to "purchase" pension credits. There was, therefore, a bargained-for exchange, and the terms of the exchange were set by *1157 the General Assembly. In the short term, the State received the plaintiffs' money and was able to invest plaintiffs' money as it saw fit, or to use the money to cover current obligations of the pension system. In the long term, plaintiffs' short-term sacrifices were to be repaid in the form of benefits.
The third reason that plaintiffs are party to a contract with the State is that the circumstances surrounding the enactment and implementation of the statute induced plaintiffs to rely on their secure position within the System.[6] At the time that the Eviction Act was passed, plaintiffs had been participants in the Retirement System for four years. Some were actually receiving pension benefits. From 1990 to 1994, the System had accepted plaintiffs' money on the same terms that it had for all other participants. The State had treated plaintiffs as full members of the System, calculating their benefits and processing their retirement elections according to the terms of Chapters 8 through 10. In addition, and perhaps most importantly, the State did not appeal the orders of the Superior Court allowing the plaintiffs to join the System. The failure to appeal, at a minimum, suggests acquiescence on the part of the State to plaintiffs' participation in the System. Certainly, the State gave no indication to the plaintiffs that their benefits were not secure. Indeed, the effect of state conduct suggested the opposite. As a result, plaintiffs' alleged reliance was not unreasonable.
The application of traditional contract law principles serves to demonstrate the actual structure and content of the contract between the plaintiffs and the Retirement System. In order for an agreement to be enforceable under contract law, the parties must manifest their objective intent to be bound. UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 641 A.2d 75, 79 (R.I. 1994) (applying R.I. law). Such intent is manifested through one party's offer and the other party's acceptance of the offer. Smith v. Boyd, 553 A.2d 131, 133 (R.I.1989). When the offeror seeks acceptance though an act of performance on the part of the offeree, the offeror proposes a unilateral contract. Flanders + Medeiros, Inc. v. Bogosian, 868 F.Supp. 412 (D.R.I.1994). A unilateral contract consists of a promise made by one party in exchange for the performance of another party, and the promisor becomes bound in contract when the promisee performs the bargained for act. B & D Appraisals v. Gaudette Machinery Movers, Inc., 733 F.Supp. 505, 508 (D.R.I.1990).
Section 36-9-33 functioned as an offer. The Restatement defines an offer as a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts, § 24 (hereinafter Restatement). Clearly, that is an apt description of § 36-9-33. The State induced plaintiffs to contribute money to the System in order to receive benefits in the future. The State would benefit in the short term by receiving plaintiffs' contributions. This statute expresses a clear indication by the State that plaintiffs should be allowed to enter the Retirement System, so long as plaintiffs agreed to the State's terms. See In re Newport Plaza Associates, L.P., 985 F.2d 640 (1st Cir.1993).
The status of public pension system law at the time when Section 36-9-33 was passed is, to some extent, probative of the legislative intent behind its enactment. By 1987, the argument that pensions were a gratuity of the state had long since fallen from favor. See, e.g., Note, Public Employee Pensions in Times of Fiscal Distress, 90 Harv.L.Rev. 992, 994-98 (1977) (reflecting that Pennie v. Reis and the gratuity approach had been widely criticized by 1977). By enacting a statute in 1987 which allowed plaintiffs to voluntarily join and thereafter contribute to the Retirement System, the General Assembly extended, according to the prevailing view of public pension systems, a statutory offer. Although Rhode Island did not itself weigh in on this question until the Almeida opinion was issued in 1992, the legal groundwork suggesting *1158 that pension systems were contractual was already established throughout the country.
Defendants argue that there was no legislative intent to make an offer or to form a contract through Section 36-9-33, since "most of the legislators who voted on the bill [were] ignorant as to the legislation's basic terms and provisions." Defendant Mayer's Memorandum of Law, at 4-5 (also quoting various legislators who claim that most of the legislators did not know the effect of Section 36-9-33). This argument clearly fails. Whether or not every legislator who voted for passage of this statute understood its terms is not an issue. Rather, it is the intent of those persons who drafted the statute  as expressed through the language of the statute  that is imputed to all of the legislators that voted for it. Since those legislators offered plaintiffs the opportunity to voluntarily participate in and contribute to the Retirement System, their legislation constituted an offer.
That the Retirement Board did not appeal either order of the Superior Court allowing the plaintiffs into the System is further evidence of the fact that § 36-9-33 was an offer. Had the Retirement Board not meant to be bound contractually, it could have appealed those orders to the Rhode Island Supreme Court.[7] However, the Retirement Board took no such action. The Board's inertia resulted in the finality of the orders of the Superior Court allowing the plaintiffs to join the System. In addition, the legislature did not act promptly to reverse the effects of the Superior Court orders by clearly making the Repeal Statute retroactive and preventing the plaintiffs from entering into the System. This illustrates graphically that the General Assembly intended § 36-9-33 to be an offer to plaintiffs to create a contract.
The individual plaintiffs accepted the statutory offer by taking the actions that the statute required in order to participate in the System. The Restatement states that "[a]cceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a performance which operates as a return promise." Restatement, § 50. In this case, the plaintiffs did exactly what the statute required. The employers voted to participate in the System, the individual plaintiffs chose not to opt out of the System, and the employers and the individual plaintiffs contributed to the System at the rate that the statute required. The offer was accepted on the terms that it proposed. Thus, a meeting of the minds was accomplished.
The Repeal Statute was the revocation of the offer. The Restatement states that "where an offer is made by advertisement in a ... general notification to the public ..., the offeree's power of acceptance is terminated when a notice of termination is given publicity by advertisement or other general notification equal to that given to the offer and no better means of notification is reasonably available." Restatement, § 46. Since Section 36-9-33 was repealed in the same manner that it was created (by legislative act), the revocation was effective. It was the Superior Court that determined as a matter of statutory interpretation that this *1159 revocation did not apply to the plaintiffs. As a matter of contract law, since the revocation occurred after plaintiffs' acceptance of the offer, the revocation was not effective as to plaintiffs. See Merritt Land Corp. v. Marcello, 110 R.I. 166, 291 A.2d 263 (1972).
Finally, the agreement between the State and the plaintiffs is supported by consideration. Contracts implied in fact require consideration as express contracts do. Hayes v. Plantations Steel Co., 438 A.2d 1091, 1094 (R.I.1982). Rhode Island law, which reflects the majority position, says that "consideration consists either in some right, interest or benefit accruing to one party or some forbearance, detriment or responsibility given, suffered or undertaken by the other." Id. (citing Dockery v. Greenfield, 86 R.I. 464, 136 A.2d 682 (1957); Darcey v. Darcey, 29 R.I. 384, 71 A. 595 (1909)).
Section 36-9-33 actually raises two different questions regarding consideration. The two different questions arise from two different subsections of that statute. The first subsection, 36-9-33(a), which allows prospective participation in the System, requires that contributions be taken from the employees' salaries. For prospective participation, then, this voluntary contribution from plaintiffs' paychecks was intended to be the consideration. See Bender v. Anglin, 207 Ga. 108, 60 S.E.2d 756 (1950). The plaintiffs were to pay presently to receive retirement credits, and the retirement credits could be cashed in for benefits in the future. The second subsection, 36-9-33(b), raises a more complex question of consideration. Subsection 36-9-33(b) allowed union members who were opting into the Retirement System under the terms of Subsection (a) to purchase retirement credits in the System for time that they had spent employed by the unions or by out-of-state school systems. The State allowed the plaintiffs to purchase the credits at a price equal to ten percent (10%) of the employee's first year's earnings as a full-time employee multiplied by the number of years, or any fraction thereof, that the employee had worked. Defendants have urged this Court to find that plaintiffs' purchase of past credits did not amount to a contract with the state. Defendants' principal argument is that because plaintiffs were given the option to purchase the credits at an allegedly "discounted" rate, the Court should find that no contract exists.
Defendants' argument fails for two reasons on this motion to dismiss. First, the argument requires this Court to assume facts in favor of the defendants, i.e. that the rate at which plaintiffs purchased the past credits was a "discounted" rate. Obviously, a court cannot assume facts in favor of a defendant on a motion to dismiss.
Defendants' argument also fails as a matter of law. In analyzing whether or not a contract exists, this Court need not consider the adequacy of consideration. Restatement, § 79. The mere existence of some bargained-for exchange is enough to support a contractual relationship. And where, as here, there is a direct exchange of money for retirement credits, there is a clear bargained-for exchange. Moreover, it was the State itself who set the terms of that bargain. At this point, however, this Court offers one clarification: whether or not that contract exists is an entirely different question from whether a contract is enforceable. Defendants' arguments regarding the adequacy of consideration go to the latter question, though the merits of that question cannot be decided at this point, since all facts on a motion to dismiss must be decided in favor of the plaintiffs.
The consideration that flowed between the plaintiffs and the State proves that plaintiffs have not been extended a mere gratuity by the State. Persons who received a gratuity have no right to bring a claim under the Contract Clause, regardless of whether they have taken actions in reliance on the gratuitous statute or not. It is plaintiffs' contributions to, participation in and interactions with the System that distinguish them from the plaintiffs in Hoffman v. City of Warwick, 909 F.2d 608 (1st Cir.1990). In that case, the First Circuit considered the constitutionality of the retroactive repeal by the Rhode Island General Assembly of a 1945 statute providing for enhanced seniority in employment for returning war veterans. The named plaintiffs in Hoffman were two veterans who were *1160 employed by Rhode Island municipalities. Those plaintiffs had been unaware of the seniority statute when they applied for and accepted employment with the municipalities, and the municipalities had not granted plaintiffs seniority credit for the time they had spent in the military. However, when the plaintiffs became aware of the statute in 1984, they requested the enhanced seniority. Before the seniority was conferred, the Rhode Island General Assembly repealed the statute in 1985. Upon the repeal, plaintiffs brought suit, claiming that the legislature had interfered with their employment contracts, thereby violating the Contract Clause, the Equal Protection Clause, and the Due Process Clause of the United States Constitution. Judge Torres, of this Court, dismissed the complaint for failure to state a claim by relying on this writer's opinion in West v. Town of Bristol, 712 F.Supp. 269 (D.R.I.1989). The First Circuit affirmed the dismissal.
In analyzing the plaintiffs' Contract Clause claim, the First Circuit noted that the Contract Clause is "applicable to contracts into which a state enters, but normally state statutory enactments do not of their own force create a contract with those who the statute benefits." 909 F.2d at 614 (emphasis in original) (citations omitted). The Court found that the goal of the repealed statute  enhancing the employment status of veterans  was a unilateral "entitlement[] analogous to welfare and other governmental benefits," and not an offer and acceptance that would lead to enforceable contract rights. Id. The Court also noted that the circumstances surrounding the statute did not suggest a "legislative intent to create private contractual rights." Id. Accordingly, since the statute did not constitute a contract, the Court held that plaintiffs' Contract Clause claim must fail as a matter of law.
There are two basic differences between the Hoffman case and this case. First, the plaintiffs in Hoffman gave no consideration to realize the benefits of the statute they sought to enforce. Their simple statutory receipt of enhanced employment status is therefore a gratuity. It was an award of merit, a gesture of thanks by the state, and the group to receive the award needed to perform no sacrifice to realize it. The statutory offer in this case is different. It allowed plaintiffs to voluntarily contribute money to the state, and, in exchange, the State would make them part of the System. Plaintiffs had to sacrifice money in the short term in exchange for benefits to be paid in the long term. The State observed this System for four years, giving the plaintiffs credit in the System, while accepting their money and using it for the purposes that the State saw fit. The statute, therefore, does not confer a gratuity upon plaintiffs.
The second difference is that the plaintiffs in Hoffman were suing to enforce their expectations of receiving a statutory benefit while plaintiffs in this case are recipients of statutory benefits, seeking to prevent the State from taking those benefits away. The Eviction Act was passed four years after the plaintiffs' participation in the Retirement System had been sealed with judicial imprimatur. See Rhode Island Federation of Teachers v. Employees Retirement System of Rhode Island, Order, December 11, 1989. As four-year participants in the Retirement System, both the individual plaintiffs and their employers had contributed to the System and had relied on the benefits guaranteed by the System in making substantial life plans and changes. In Hoffman, on the other hand, plaintiffs had never received any benefit, nor any indication that they were party to a contract. They had never paid money for a benefit, had alleged no reliance on the benefit (except to request it), and had not been promised the benefit from their employers. Those plaintiffs simply had no Contract Clause claim against the state, as they were not party to any contract, express or implied.
If there was any gratuity in this case, it was the State's offer to the plaintiffs to join the System. However, plaintiffs have not brought suit under the Contract Clause alleging that they have a contractual right to join the Retirement System.[8] Were that the *1161 case, plaintiffs would have filed suit to challenge the Repeal Act, which extinguished § 36-9-33. Instead, plaintiffs' constitutional challenge poses an entirely different question, one that arises out of the enactment of the Eviction Act, § 36-9.1-2. The question is whether, once plaintiffs have been part of a voluntary, contributory Retirement System for four years, they are party to a contract with the State.[9] This Court reiterates that for purposes of federal constitutional law they are parties to a contract.
It is clear that plaintiffs would have failed to prove a contract between themselves and the State if they had brought a Contract Clause challenge to the Repeal Statute in 1989. At that point, plaintiffs would have been similarly situated to the plaintiffs in Hoffman: both would have sought enforcement of a statute that had not been implemented. However, unlike the trial court in Hoffman, the Rhode Island Superior Court decided that, as a matter of statutory interpretation (and not Contract Clause interpretation), plaintiffs were to be made part of the Retirement System. When plaintiffs' participation in the System was determined as a matter of law, the foundation for a contract between the plaintiffs and the Retirement System was laid. Plaintiffs became parties to a contract with the Retirement System when money started to be withheld from their paychecks and the State conferred upon them service credits in the System.
Defendants have also argued that since plaintiffs are not party to an employment contract with the State, and that since a pension arises out of a contract of employment, plaintiffs cannot be deemed to be parties to a contract with the State. This Court, however, cannot observe this distinction. The General Assembly, in its wisdom (or lack thereof), chose to enact § 36-9-33, and thus recognized that certain public union employees deserved to be part of the State Retirement System. The legislature therefore stated that, at least with respect to pension benefits, there was no difference between being employed for the State and being employed by organizations that represent state employees for purposes of collective bargaining. The effect of the statute was to treat the unions like the State, i.e., to require them to contribute to a voluntary retirement plan at exactly the same rate as any local education agency did for its certified teachers. In addition, there is another reason that defendants' distinction fails. In this case, where the plaintiffs had to choose to enter the Retirement System and had to contribute their money to do so, their contract with the State exists outside of the contract of employment. It is not a contractual aspect of the employment contract itself.
It is because plaintiffs voluntarily opted into the System, contributed to it, participated in it for four years, and made decisions about their lives in response to their settled relationship, that the plaintiffs and the Retirement System are parties to an implied contract. In summary, defendants' argument that there is no contract between the plaintiffs and the state in this case because plaintiffs are not state employees, is totally without relevance.
It is not necessary to hold that the contract that has been formed between the plaintiffs and the Retirement System should be understood as a fluid or flexible arrangement. To that extent, this holding is unlike that of the Supreme Judicial Court of Massachusetts in Opinion of the Justices, 364 Mass. 847, 303 N.E.2d 320 (1973). In that case, the Court held that the direct statutory contract between the state and its employees "should be understood here in a special, somewhat relaxed sense." Id., 303 N.E.2d at 327. The Court noted that the contract model is "best understood as meaning that the retirement scheme has generated material expectations on the part of employees and those expectations should in substance be *1162 respected." Id. at 328. However, by allowing the contract to be understood in a "special, somewhat relaxed sense," the Court allowed the legislature to make reasonable modifications to the system without creating a breach of contract cause of action on behalf of the participants. By reading flexibility into the "contract," the Court clearly sought to protect the interests of the employees in receiving a pension, while simultaneously allowing the legislature to make changes to the system that were fair and reasonable.
The same problem, however, does not present itself in this case, as plaintiffs have brought suit under the Contract Clause. By holding that the plaintiffs are party to a contract with the Retirement System as a matter of federal constitutional law, this Court does not prevent the General Assembly from making changes to the laws implementing the pension system. On the contrary, this Court is compelled to permit the General Assembly to make modifications to the Retirement System contract, so long as those modifications are "reasonable and necessary to serve an important governmental interest." United States Trust, 431 U.S. at 25, 97 S.Ct. at 1519. Thus, unlike a breach of contract cause of action which prevents any unilateral modification to a contract, the Contract Clause merely requires that contractual modifications to the pension system pass the constitutional test of intermediate scrutiny.

2. Whether Plaintiffs' Contractual Rights Have Been Substantially Impaired
Since the Court has concluded that plaintiffs were party to a contract with the Retirement System, the next question which arises is whether the Eviction Act substantially impairs the contractual relationship between the individual plaintiffs and the System. Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. at 704. The impairment need not result in a "total destruction" of the employees' contract rights to be considered substantial. United States Trust, 431 U.S. at 26, 97 S.Ct. at 1519-20.
Obviously, the Eviction Act substantially impairs plaintiffs' contract with the Retirement System. The Act totally extinguishes all of the retirement benefits that the individual plaintiffs acquired pursuant to § 36-9-33 and upon which they have relied for four years. Indeed, the Eviction Act contemplates the paradigm of "substantial impairment." Many other courts have considered far less significant impairments to be considered substantial. Nevada Employees Assoc., Inc. v. Keating, 903 F.2d 1223, 1227 (9th Cir.), cert. denied, 498 U.S. 999, 111 S.Ct. 558, 112 L.Ed.2d 565 (1990) ("substantial impairment" when the state changes its retirement system from one where employees could withdraw their contributions at any time to one where employees exercising early withdrawal would have to pay a penalty); Association of Surrogates v. State of New York, 940 F.2d 766 (2d Cir.1991), cert. denied, 502 U.S. 1058, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992) ("substantial impairment" when the state delays the payment of ten days salary to certain state employees during a fiscal crisis and promised to pay salary at later date). Therefore, this Court opines that the Eviction Act substantially impairs plaintiffs' implied contract with the State as a matter of law.

3. Reasonable and Necessary to Serve an Important Public Purpose
The third and final question that this Court must consider in an analysis under the Contract Clause is whether the substantial impairment of plaintiffs' contractual rights is "reasonable and necessary to serve an important public purpose." United States Trust, 431 U.S. at 25, 97 S.Ct. at 1519. Defendants' motion to dismiss alleges that this determination can be made as a matter of law. Defendants make three points to show that the statute is both reasonable and necessary: (1) preserving the Retirement System for the sole benefit of the public employees for whom the System was established; (2) correcting the unfairness inherent in the payment of grossly disproportionate rates of return and a windfall benefit of almost $10 million to the plaintiffs; and (3) avoiding severe economic penalties to the Retirement System and its members by preventing loss of the Retirement System's crucial tax-exempt status as a qualified government plan. Defendants have relied on the "Findings" *1163 section of the Eviction Act as the foundation for these proffers.
It is clear that when this Court considers whether an enactment is constitutional, or, more specifically, "whether an act serves a public purpose, the self-serving recitation of a public purpose contained within the legislation is not conclusive." In re Advisory Opinion to the Governor (DEPCO), 593 A.2d 943, 947 (R.I.1991). Of course, great deference should be given to a public purpose articulated by the legislature, as the legislature "is vested with wide discretion to determine the existence of a public purpose...." Id. As a result, this Court acknowledges the legislature's justifications for the Eviction Act. However, this Court is not bound to accept these determinations, especially on a motion to dismiss. Rather, this Court must examine plaintiffs' Complaint to determine whether plaintiffs have articulated a compensable claim as a matter of law.
Plaintiffs have sufficiently alleged that the Eviction Act is neither reasonable nor necessary to serve an important public purpose. Complaint, ¶ 23. Plaintiffs have essentially alleged that the Eviction Act was an illegitimate exercise of the state's police power because there were less intrusive ways to effect the statute's goals. On a motion to dismiss, those allegations must be accepted as provable. In any event, defendants' three justifications can be summarily disposed of at this point. The first justification  that the system should be preserved for the persons for whom it was created  is simply a conclusory description of the goal of this legislation and fails to articulate an important public purpose, especially in light of the impact that the legislation has on the plaintiffs. The second justification  that the statute is unfairly beneficial to the plaintiffs  is fraught with questions of fact, and such questions are inappropriately decided at this point.[10] The third justification  that the System will lose its status as a qualified government plan under ERISA  does raise an important public interest. However, this justification cannot be accepted at this juncture. It is by no means clear that the Eviction Act is both reasonable and necessary to avoid the loss of qualified government plan status. Both sides have articulated reasons why the System may or may not retain its tax-exempt status. Since, at this point, all doubts are to be resolved in favor of the plaintiffs, defendants' argument fails. Moreover, to some extent, defendants' argument seems disingenuous. Rhode Island has a history of collaborating with the federal government to compromise on federal regulation of its pension systems. A perfect example is the negotiations that have occurred regarding the pensions for state legislators. Furthermore, neither at the time that the Repeal Statute was passed nor at the time that the Superior Court ruled that plaintiffs had to be participants in the System, did the Retirement Board voice concern that § 36-9-33 might have adverse tax consequences. In fact, quite shockingly, the Retirement Board did not even appeal the ruling of the Superior Court that held that plaintiffs were rightful participants in the Retirement System. Finally, during the four years that plaintiffs have been part of the Retirement System, no attempt has been made by the federal government to withdraw the plan's tax-exempt status. At this point, therefore, this Court refuses to blindly accept defendants' assertion that the plan will lose its tax-exempt status because of plaintiffs' participation in the system. It is pure speculation at best.
This Court also notes that defendants' second justification may play a significant role in this case. Understood broadly, that justification  that the statute is unfairly beneficial to the plaintiffs  implicates the fiscal health of the System. Though the question of the health of the System is undoubtedly a question of fact inappropriately resolved on a motion to dismiss, this Court notes that the Supreme Court has held that states may suspend contractual obligations during an economic crisis. Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). An overall assessment of whether the statute is "reasonable and necessary to serve an important public interest" will therefore balance the substantial *1164 impairment of plaintiffs' contract, the existence of an "important general social problem," and the existence of an emergency. Allied Structural Steel v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).
The determinations that defendants seek to have the Court make on this motion are simply premature. Currently, this Court has conflicting information before it, the substance of which is relevant to the determination of whether this statute is reasonable and necessary. On a motion to dismiss, this Court need not weigh this conflicting information. Rather, the Court must accept what the plaintiffs' have stated in their Complaint, and plaintiffs have sufficiently alleged that the Eviction Act is not reasonable and necessary to serve a compelling state purpose. The motions to dismiss the first cause of action in the Complaint, therefore, are denied.

B. Due Process Claim
The second cause of action stated in plaintiffs' Complaint proceeds under the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. In this count, plaintiffs allege that their retirement benefits were property interests that are entitled to protection from arbitrary state action. The Eviction Act, in plaintiffs' view, denied plaintiffs due process of law by retroactively depriving them of this property interest. Plaintiffs also allege that they have, in the past, taken both professional and financial actions in reliance on the expected benefits and that there is no legitimate state interest to support the denial of their benefits. These allegations amount to a substantive due process claim.[11]
Defendants' motions to dismiss challenge the validity of plaintiffs' claims as a matter of law. Defendants offer two arguments to support their motion. First, defendants claim that each plaintiff's interest in the retirement benefits is not an entitlement, but rather a gratuity. If the retirement benefits are a gratuity, then plaintiffs may not claim substantive due process protections when that gratuity is taken from them. Second, defendants argue that the Eviction Act had a legitimate purpose as a matter of law. To demonstrate the legitimate purpose, defendants offer the same justifications that were used to support their argument that the statute was reasonable and necessary to serve an important public interest under the Contract Clause. Defendants also contend that the retroactivity of the Eviction Act was necessary to effectuate its legitimate goals.
Defendants' first argument fails, for it is clear that plaintiffs in this case have a property interest in their retirement benefits. As this Court stated in West v. Town of Bristol, 712 F.Supp. 269 (D.R.I.1989) (citations omitted), "[t]he predicate to a property interest is a legitimate claim of entitlement under state law.... Denial of such an entitlement in turn creates the basis for a property-interest due process claim." Plaintiffs clearly have a property interest in their retirement benefits for two reasons. First, as this Court has determined, plaintiffs have a contractual relationship with the State. Undoubtedly, contractual rights are property interests under the due process clause. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Second, even if it was determined that plaintiffs were not party to a contract with the Retirement System, it is clear that plaintiffs would still have a property interest in their retirement benefits.
In order to prove a property interest, plaintiffs must have "alleged a tangible interest in [their pension benefits] sufficient to invoke the general constitutional protection against arbitrary and irrational government action." Hoffman, 909 F.2d at 618. Plaintiffs have done so in this case. Plaintiffs' reasonable expectation of receiving a pension benefit clearly meets this test. Id., at 618 (citing Flemming v. Nestor, 363 U.S. 603, 610-11, 80 S.Ct. 1367, 1372-73, 4 L.Ed.2d 1435 (1960) (Although an employee's interest in benefits under the Social Security Act does not rise to the level of an "accrued *1165 property right," "[t]he interest of a covered employee under the Act is of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause.")).
Defendants' second argument is that plaintiffs' substantive due process claim should be dismissed because the Eviction Act has both a legitimate legislative purpose and a reasonable mechanism for achieving that purpose as a matter of law. For support, defendants rely on the same arguments that they offered to show that the Eviction Act could pass constitutional muster under the Contract Clause, namely, that the Eviction Act (1) preserves the Retirement System for the sole benefit of the public employees for whom the System was established; (2) corrects the unfairness inherent in the payment of grossly disproportionate rates of return and a windfall benefit of almost $10 million to the plaintiffs; and (3) avoids severe economic penalties to the Retirement System and its members by preventing loss of the Retirement System's critical tax-exempt status as a qualified governmental plan. Defendants also argue that these legitimate interests cannot be achieved unless plaintiffs' retirement credits are retroactively extinguished.
The test for the constitutionality of retroactive legislation was articulated by the Supreme Court in Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). In that case, the Supreme Court held that retroactive legislation is constitutional so long as the legislation effects a legitimate legislative purpose furthered by a rational means. Id. at 730, 104 S.Ct. at 2718. See Lieberman-Sack v. Harvard Community Health Plan of New England, 882 F.Supp. 249 (D.R.I.1995). Thus, while "[t]he retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process," Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976), "that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." United States v. Carlton, ___ U.S. ___, ___, 114 S.Ct. 2018, 2022, 129 L.Ed.2d 22 (1994). Furthermore, though "[r]etroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions," General Motors Corp. v. Romein, 503 U.S. 181, 190-92, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992), it is "clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." Pension Benefit Guaranty, 467 U.S. at 729, 104 S.Ct. at 2718 (citations omitted).
Defendant's three asserted justifications do not carry the day here and now. Each of the justifications offered by the defendants was rejected by this Court under its Contract Clause analysis: the first, because it is conclusory and illegitimate; the second and third, because they require that facts be assumed in favor of the defendants. Therefore, none of the arguments advanced by the defendants can establish at this juncture that the Eviction Act has a legitimate purpose as a matter of law.
Since plaintiffs have a property interest in their pension benefits, and since defendants have failed to articulate a legitimate purpose for the Eviction Act as a matter of law, defendants' motions to dismiss the second cause of action in the Complaint are denied.

C. Takings Clause
The third cause of action stated in plaintiffs' Complaint proceeds under the Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment and 42 U.S.C. § 1983. In this count, plaintiffs allege that the Eviction Act amounts to a taking of their property rights, i.e., their contractual rights with the Retirement System, without just compensation. Defendants' motions to dismiss challenge the legal sufficiency of this claim.
The Takings Clause provides that "private property" shall not "be taken for public use without just compensation." U.S. Const. amend. V. This clause, which is applicable to the states through the Fourteenth Amendment, see, e.g., Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980), protects individuals from economic disadvantage when their property is taken by governmental action.
*1166 The question that the parties significantly dispute is whether or not plaintiffs' interests in their retirement benefits constitute private property, that is, property that is capable of being "taken." However, now that this Court has determined that plaintiffs had a contractual right to receive their benefits, this question may be disposed of summarily. It is clear that contract rights are protected by the Takings Clause. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984); United States Trust, 431 U.S. at 19 n. 16, 97 S.Ct. at 1516 n. 16 ("[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Contributors to Pennsylvania Hospital v. City of Philadelphia, 245 U.S. 20, 38 S.Ct. 35, 62 L.Ed. 124 (1917) (same).
Once it is established that the Section 36-9-33 retirement benefits constitute property, it is necessary to determine whether the Eviction Act constitutes a taking of that property without just compensation. In evaluating Takings Clause challenges, the Supreme Court has identified three factors as being of "particular significance:" "(i) `the economic impact of the [statute] on the claimant'; (ii) `the extent to which the [statute] has interfered with distinct investment-backed expectations'; and (iii) `the character of the governmental action.'" Bowen v. Gilliard, 483 U.S. 587, 606, 107 S.Ct. 3008, 3020, 97 L.Ed.2d 485 (1987) (quoting Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). Considering each of these factors, it is clear that plaintiffs have sufficiently alleged a compensable taking in this case.
First, the Eviction Act's economic impact is severe. Though plaintiffs would have received the actual amount of their contributions plus interest upon expulsion from the System, plaintiffs have sufficiently alleged that this amount does not comport with the amount that plaintiffs expected to receive when they took actions in reliance on being part of the Retirement System. The Eviction Act would have ousted plaintiffs after four years of participation in the System, a time during which plaintiffs declined other opportunities and changed their life plans. Those factual allegations are sufficient to show severity for purposes of a motion to dismiss.
Second, the Eviction Act interferes with plaintiffs' investment-backed expectations. The individual plaintiffs made large contributions to the Retirement System both to purchase past credits and to participate in the System in the future. Plaintiffs have clearly alleged that these contributions were made with the expectation of receiving benefits in the future. Since plaintiffs expected to receive those benefits, their allegations are sufficient to show adequate interference with their investment-backed expectations and, therefore, survive defendants' motions.
Third, plaintiffs have sufficiently alleged that the nature of the government's action in this case is intrusive enough to be considered a taking. Plaintiffs state that because the Eviction Act extinguished all of the retirement credits that plaintiffs accrued, that the State's action terminates all interest that the plaintiffs might have in the subject matter. Clearly, by removing plaintiffs from the System, they can no longer request their retirement credits; their rights have been abolished.
Plaintiffs have also sufficiently alleged that the Eviction Act does not provide just compensation for what has been taken from them. While an actual determination of whether the statute actually provides just compensation to the plaintiffs is a fact-bound inquiry improperly resolved at this point, it is clear that, when the facts are assumed in plaintiffs' favor, they have alleged inadequate compensation. This is shown directly, since the alleged value of the extinguished retirement benefits is greater that the amount of money that would be returned to the plaintiffs by the statute. As a result, defendants' motions to dismiss the third cause of action are denied.

IV. Conclusion
For the foregoing reasons, defendants' motions to dismiss the three causes of action asserted in plaintiffs' Complaint are denied.
It is so ordered.
NOTES
[1] Though the defendants have filed separate motions, this Court will consider all of the arguments made by both movants. This opinion will not distinguish between the two motions.
[2] This Court may refer to the contract that plaintiffs seek to prove as either a contract with the Retirement System or a contract with the State.
[3] Defendants urge this court to examine only § 36-9-33, and not the remainder of Chapters 8 through 10 of Title 36, to find a contract. This, however, is counterintuitive to plaintiffs' claim. Plaintiffs allege they were party to a contract when the Eviction Act was passed in 1994. At that time, plaintiffs had been participants in the Retirement System for four years, and the terms of their relationship with the State was contained in Chapters 8 through 10 of Title 36. Thus, it is those statutes that must be examined.
[4] These claims have proceeded both under breach of contract theories or under constitutional impairment of contract theories. The matter that is before this Court is clearly of federal constitutional dimension.
[5] It was the Rhode Island pension system for the Judiciary, not the one at issue in this case.
[6] Plaintiffs' allegations of reliance in the Complaint must be accepted as true for purposes of this motion to dismiss.
[7] It is probable that the Rhode Island Supreme Court would have interpreted the Repeal Statute to apply retroactively, and it is probable that the Court would have found it to be constitutional in light of Brennan v. Kirby, 529 A.2d 633 (R.I. 1987). In that case, the Rhode Island Supreme Court considered the question of whether the retroactive repeal of a state statute conferring enhanced seniority in employment upon veterans was unconstitutional. In finding that the statute did not violate due process, the Court noted that "[i]n this particular case, the degree of unfairness to plaintiffs is negligible because they never relied upon [the seniority statute] when they applied for and accepted employment. And there is no evidence to suggest that they would have foregone municipal employment had they been aware that no seniority benefits would have been credited." Id. at 640-41 (emphasis added). Since the plaintiffs in this case could not have reasonably relied on the benefits promised by § 36-9-33 at the time that the Repeal Statute was passed, they could not have brought a successful constitutional challenge to the Repeal Statute. It is only because the Eviction Act came four years after the orders of the Superior Court were final  a time during which plaintiffs had participated in the Retirement System on equal footing with all other participants  that their reliance was reasonable. And it is that reliance, coupled with their voluntary participation and contributions to the System, that distinguish them from the plaintiffs in Brennan.
[8] In other words, plaintiffs are not arguing that the Contract Clause requires that 36-9-33 be enforced. Plaintiffs instead ask that 36-9.1-2, the Eviction Act, not be enforced.
[9] If this Court were to hold that the Retirement System statutes did not amount to a contract between the participants and the State, then the General Assembly could, at any time, make any unilateral modification to the System without constitutional recourse. In other words, the Constitution could not prevent the General Assembly from evicting classes of employees from the System or from reducing or even eliminating benefits. This would be due to the fact that the pension system would necessarily be a gratuity. Such a holding would be clearly incompatible with the Retirement System's purpose and the intent of the General Assembly in enacting it.
[10] One such question is whether plaintiffs were allowed to purchase credits in the System at an actuarially sound rate, and, if not, who allowed them to do so.
[11] In other words, plaintiffs do not argue that the taking of their pension rights was procedurally deficient. Rather, they argue that, regardless of the procedure employed by the legislature, the very act of taking itself was an improper exercise of governmental power.