Edward A. McGRATH, Plaintiff,

v.

RHODE ISLAND RETIREMENT BOARD, By and Through Nancy MAYER, General Treasurer, Defendant.

Civ. A. No. 94–0322L.

United States District Court, D. Rhode Island.

Nov. 1, 1995.

Edward C. Roy, Jr., Roy & Cook, Providence, RI, for Plaintiff.

Claire J.V. Richards, David D. Barricelli, Hinckley, Allen & Snyder, Providence, RI, for Defendant.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 12.1. Plaintiff Edward A. McGrath ("McGrath"), a former municipal employee of the City of Cranston, challenges the constitutionality of R.I.Gen.Laws § 45–21–16 (1993), as amended in June 1992. In his First Amended Complaint, plaintiff seeks declaratory and monetary relief pursuant to 42 U.S.C. §§ 1983 and 1988. The Retirement Board, by and through Nancy Mayer, in her official capacity as Chairperson and Treasurer of the Retirement Board, asserts that R.I.Gen.Laws § 45–21–16 (1993) is constitutional on its face and as applied by the Retirement Board, and that the Board is entitled to judgment as a matter of law. For the following reasons, plaintiff's motion for summary judgment is denied, and defendant's cross motion is granted.

## I. Undisputed Background Facts

The Rhode Island Employees' Retirement System ("Retirement System" or "System") is, in truth, an amalgamation of two pension systems: a program for state employees, governed by R.I.Gen.Laws §§ 36–8–1 to –10–38 (1990), and a second for municipal employees, governed by R.I.Gen.Laws §§ 45–21–1 to –62 (1991 & Supp.1994). While the distinction has little everyday meaning, the interaction of the two systems and their authorizing statutes bears on the 1992 amendment of R.I.Gen.Laws § 45–21–16, and a quick review of the history of the Retirement System is appropriate.

In 1936, Rhode Island established a pension system for state employees. 1936 R.I.Pub.Laws ch. 2334. Today, participants in the System receive retirement, disability, survivor and death benefits. Responsibility for the administration and operation of the Retirement System was and still is vested in the Retirement Board pursuant to R.I.Gen. Laws § 36–8–3. In 1951, Rhode Island established a statewide pension system for municipal employees, 1951 R.I.Pub.Laws ch. 2784, through which participating cities and towns could offer their workers the same retirement benefits granted to state employees. R.I.Gen.Laws § 45–21–4. The Retirement Board assumed responsibility for the municipal employees' system, § 45–21–32, and since that time has run the two systems, in effect, as a single retirement system. Nevertheless, the Retirement Board serves two statutory masters: it is organized and empowered under §§ 36–8–1 to –10–38, though it must run the municipal employees' retirement system in accordance with §§ 45–21–1 to –62.

On April 9, 1986, McGrath went to work for the Department of Senior Services of the City of Cranston as a probationary employee. He was embarking on a second—or even third—career: He had served in the military from February 16, 1951 to May 1, 1953, and had been engaged elsewhere during the intervening decades. Six months later, on November 28, 1986, McGrath became a municipal employee of Cranston and henceforth a municipal member of the Retirement System. Throughout his period of service, which lasted until April 28, 1994, Cranston made contributions to the Retirement System on McGrath's behalf. Additional monies were deducted regularly from McGrath's pay—during the first two and a half years of his membership, from November 1986 through May 1989, he contributed $4,075.41 to the System.

Cranston's Director of Personnel informed the Retirement Board on February 27, 1991, that McGrath wanted to purchase credit in the Retirement System for his two and a half years in the military and for his six months of probationary service. The military service credit was available to McGrath by virtue of R.I.Gen.Laws § 45–21–53 (1991):

**Armed service credit.**—Any active municipal employee who served on active duty in the armed service of the United States or in the merchant marine service of the United States as defined in section 2 of chapter 1721 of the public laws, 1946, may purchase credit for that service up to a maximum of four (4) years; pursuant to the provisions of § 36–9–31.

R.I.Gen.Laws § 36–9–31 (1990) read:

**Armed service credit.**—(a) Any active member of the retirement system, who

served on active duty in the armed service of the United States or in the merchant marine service of the United States as defined in § 2 of chapter 1721 of the public laws, 1946, may purchase credit for that service up to a maximum of four (4) years; provided that he or she has received an honorable discharge; provided, that any member who served any fraction of a year less than six (6) months shall be allowed to purchase six (6) months of service for each fraction and for any fraction of a year six (6) months or greater shall be permitted to purchase one year of service; provided, further, that any employee on an official leave of absence for illness or injury shall be eligible to purchase military credits as defined herein while on that leave of absence.

(b) Any active member of a retirement system as defined in chapter 16 of title 16, chapters 8, 9, 10 of this title or chapter 21 of title 45 may purchase credits for such military service into any system the person is actively participating in, regardless of whether the member has purchased credits for such military service in any other system.

(c) The cost to purchase these credits shall be ten percent (10%) of the member's first year's earnings as a state employee, teacher, municipal employee, or legislator as defined in chapters 9 of this title, 16 of title 16 and 21 of title 45 multiplied by the number of years and fraction thereof of such armed service up to a maximum of four (4) years.

(d) There will be no interest charge provided the member makes that purchase during his or her first five (5) years of membership in the retirement system, but will be charged regular interest to date of purchase from date of enrollment into membership, if purchased after completing (5) years of membership; provided, however, any member who was in the retirement system prior to July 1, 1980, would not be charged interest whenever he or she purchases the armed services credit.

McGrath's purchase of probationary credit was permitted under R.I.Gen.Laws § 45–21–9(b) (1991), which allowed municipal members to "purchas[e] credit for prior service with the city or town of which the employee is now employed."

On March 20, 1991, the Retirement Board informed McGrath that the cost for two and half years of military credit would be $4,316.09 (10 percent of his first year's salary multiplied by 2.5). The Retirement Board also told McGrath that he could purchase probationary credit for the period of April 9, 1986 to November 2, 1986 (a total of six months and twenty-four days) at a cost of $917.53, including interest. On April 15, 1991, McGrath paid the requested sums and received the military service and probationary credits, collectively known as "purchase credits."

In April 1991, McGrath's eligibility for a retirement pension was determined by R.I.Gen.Laws § 45–21–16 (1991):

**Retirement on service allowance.**—Retirement of a member on a service retirement allowance shall be made by the retirement board as follows:

Any member may retire upon the member's written application to the retirement board as of the first day of the calendar month in which the application was filed, provided the member was separated from service prior thereto, and provided, further, that if separation from service occurs during the month in which application is filed, the effective date shall be the first day following the separation from service, provided that the member at the time so specified for the member's retirement shall have attained the applicable minimum retirement age *and shall have completed at least ten (10) years of total service* or who, regardless of age, completed thirty (30) years of total service, and notwithstanding that during the period of notification the member may have separated from service. The minimum ages for service retirement (except for employees completing (30) years of service as above provided) shall be fifty-eight (58) years.

(Emphasis added.) Similarly, R.I.Gen.Laws § 36–10–9 (1990) provided that a member who was over sixty became eligible upon "complet[ion] of *at least ten (10) years of total service.*"

(Emphasis added.)

Thus on April 15, 1991, when McGrath bought his military and probationary credits, a municipal employee who met the minimum age requirement needed to accumulate ten years of total service before his pension rights vested and he became eligible for retirement. The computation of his period of total service was accomplished by adding his purchase credits to his years of actual employment. McGrath, after buying three years' worth of credits, needed to work for the City of Cranston for seven years before vesting; he would have been eligible to retire in November 1993.

Shortly thereafter, in June 1991, the Rhode Island General Assembly sought to change the method by which the Retirement Board calculated the minimum years of required service for vesting purposes. The General Assembly appended subsection (c) to § 36–10–9, effective June 16, 1991:

> (c) Except as specifically provided in § 36–10–9.1, §§ 36–10–12 through 36–10–15 and §§ 45–21–19 through 45–21–22 of the general laws, no member shall be eligible for pension benefits under this chapter *unless the member shall have been a contributing member of the employee's retirement system for at least ten (10) years.* Provided, however, a person who has ten (10) years service credit shall be vested. Any person who becomes a member of the employee's retirement system pursuant to § 45–21–4 shall be considered a contributing member for the purpose of title 45, chapter 21 and this chapter.

R.I.Gen.Laws § 36–10–9(c) (Supp.1993) (emphasis added); *see* 1991 R.I.Pub.Laws ch. 111. Section 36–10–9(c) appeared to amend § 45–21–16 by implication, changing the statutory minimum for pension eligibility from ten years of total service to ten years of "contributory" (actual) service. Nevertheless, § 45–21–16 was *not* expressly amended and the Retirement Board found itself in uncertain waters, unsure which statutory minimum to apply to municipal employees.

To end the confusion, the General Assembly substantially amended § 45–21–16 in July 1992. 1992 R.I.Pub.Laws ch. 306. McGrath's constitutional claims arise out of the General Assembly's addition of subsection (b), which ordained that, as of January 1, 1993, "no [municipal] member shall be eligible for pension benefits under this chapter *unless the member shall have been a contributing member of the employees' retirement system for at least ten (10) years.*" R.I.Gen. Laws § 45–21–16(b) (emphasis added); *see* 1992 R.I.Pub.Laws ch. 306. A year later, *see* 1993 R.I.Pub.Laws ch. 231, § 45–21–16(b) attained its final form:

> **Retirement on service allowance** [Effective January 1, 1993].—
>
> (b) Except as specifically provided in § 45–21–19 through 45–21–22, no member shall be eligible for pension benefits under this chapter *unless the member shall have been a contributing member of the employees' retirement system for at least ten (10) years.*
>
> (i) Provided, however, a person who has ten (10) years service credit on or before June 16, 1991 shall be vested.
>
> (ii) Furthermore, any past service credits purchased in accordance with § 45–21–62 shall be counted towards vesting.
>
> (iii) Any person who becomes a member of the employees' retirement system pursuant to § 45–21–4 shall be considered a contributing member for the purpose of this chapter.

R.I.Gen.Laws § 45–21–16(b) (Supp.1993) (emphasis added).

Seeking to retire in November 1993 or shortly thereafter, McGrath met with James M. Reilly, the assistant director of the Retirement System, on October 6, 1993, in order to determine his eligibility for a service pension. McGrath was well beyond the minimum retirement age; the only issue was whether he had accumulated enough service credit. On October 8, 1993, Reilly informed McGrath by letter that pursuant to "[l]egislation enacted in June of 1991" (an apparent reference to the amendment of § 36–10–9), McGrath needed ten years as a contributing member before becoming eligible, and hence would have to work until November 1996. No longer could he apply his military and probationary credits towards fulfillment of the ten year minimum.

However, on October 21, 1993, the Retirement Board established its formal policy with regards to § 45–21–16 and the ten year contributory service requirement:

All municipal employees who have ten years of purchased credit and service credit as of December 31, 1992 are eligible to retire upon attaining age 58. After December 31, 1992, all municipal employees must have ten years of contributory service. However, prior probationary service may be used towards the ten year requirement.

Brief for Defendant at 9. In effect, the Board ruled that the 1991 amendment of § 36–10–9 applied only to state employees. Notwithstanding the language of § 45–21–16(b)(i), which appeared to set June 16, 1991 as the last day on which a municipal employee's pension rights could vest under the total service calculation, the Board ruled that municipal employees had until December 31, 1992 to satisfy the ten year total service minimum. The policy was cold comfort to McGrath; on December 31, 1992, McGrath had a total of nine years, two months and twenty-two days of purchase and service credits. Under neither method of calculation had his rights to a pension vested.

McGrath appealed Reilly's determination to the Retirement Board on January 13, 1994. The appeal was denied. Citing § 45–21–16 and the new policy, the Board permitted McGrath to apply his six months and twenty-four days of probationary credit towards the ten year contributory service requirement, but disallowed any use of his military credit. The Board ruled that McGrath would become eligible for a retirement on a pension on April 9, 1996. Plaintiff's Exhibit A. At that time, however, his purchased military credit would augment his monthly payments from the Retirement System by approximately 5 percent. McGrath would have to work a full decade for Cranston, but he would retire with twelve and a half years' service credit, thus earning a higher pension.

McGrath resigned his position with the City of Cranston on April 28, 1994, and subsequently brought suit in this Court.

McGrath contends that § 45–21–16 (Supp. 1993), as amended in 1992 and applied to him by the Retirement Board, violates four provisions of the United States Constitution. First, he alleges that the amendment of § 45–21–16(b) requiring ten years of contributory service impairs his contractual rights in violation of the Contract Clause. U.S. Const. art. I, § 10. Second, McGrath avers that the amended statute violates the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1. Third, he argues that his inability to apply his military service credit towards vesting was a deprivation of property without due process of law, in contravention of the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. XIV § 1. Fourth, he alleges that the disallowance of military credit amounted to a taking without just compensation in violation of the Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment. U.S. Const. amend. V. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). McGrath moves for summary judgment on all his claims. The Retirement Board denies that the amendment of § 45–21–16 abridged McGrath's constitutional rights, and has filed a cross motion for summary judgment. After hearing oral arguments on the cross motions, the Court took this matter under advisement. The motions are now in order for decision.

## II. Standard for Decision

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Court must view all facts and related inferences in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d

370, 373 (1st Cir.1991). Hence, "each party's motion for summary judgment must be addressed by examining the facts and inferences in favor of the other party." *Berger v. R.I. Bd. of Governors for Higher Educ.*, 832 F.Supp. 515, 517 (D.R.I.1993).

## III. Analysis

### A. The Contract Clause

McGrath's first cause of action arises under the Contract Clause and 42 U.S.C. § 1983. McGrath argues that his purchase of military service credit pursuant to R.I.Gen.Laws § 45–21–53 (1991) on April 15, 1991 formed a contract with the Retirement System. In his view, the June 1992 amendments to R.I.Gen.Laws § 45–21–16 that barred him from applying his military credit towards vesting substantially impaired his contractual rights in violation of the Contract Clause. The Retirement Board responds that McGrath's purchase of military service credits did not create a contract as a matter of law, and therefore the Contract Clause is simply inapplicable.

The Contract Clause reads: "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10. Despite the draconian language of the Contract Clause, "its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' " *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *Home Bldg. & Loan Assn. v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934)). While the Contract Clause is applicable to contracts between a private party and a state, *Hoffman v. City of Warwick*, 909 F.2d 608, 614 (1st Cir.1990), courts must be sensitive to the states' reserved sovereignty and to their need for flexibility when addressing public concerns over time.

In determining whether § 45–21–16 violates the Contract Clause, the Court must undertake a three-step inquiry: First, "whether there is a contractual relationship"; second, "whether a change in law impairs that contractual relationship,"; third,

"whether the impairment is substantial." *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992). If the impairment is minimal, the Court's inquiry ends. *Energy Reserves*, 459 U.S. at 411, 103 S.Ct. at 704. However, if the impairment is substantial, the Court must determine whether it is "reasonable and necessary to serve an important public purpose." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977).

### 1. The Existence of a Contract

The Court must first determine whether McGrath's purchase of military service credit pursuant to §§ 45–21–53 and 36–9–31 was sufficient to form a contract *as a matter of federal constitutional law. Nevada Employees Assoc., Inc. v. Keating*, 903 F.2d 1223, 1227 (9th Cir.1990); *Pineman v. Oechslin*, 637 F.2d 601, 604 (2nd Cir.1981) (states may not evade the Contract Clause by declaring certain arrangements non-contractual as a matter of state law). The alleged contract between McGrath and the Retirement System arises out of the terms of Chapter 21 of Title 45 and Chapters 8 through 10 of Title 36 of the Rhode Island General Laws, the statutory scheme governing the Retirement Board and pensions for municipal employees.

Recently, the Court undertook a similar analysis in *Nat. Educ. Ass'n–R.I. v. Ret. Bd. of R.I. Empl. Sys.*, 890 F.Supp. 1143 (D.R.I. 1995). In 1987, the State offered membership in the Retirement System to a class of state and municipal union officials, subject to approval by the union rank and file. Officials of two teachers' unions elected to join, the necessary votes were taken, and the unions began contributing to the System on the officials' behalf. (The officials contributed a portion of their salary, too.) In addition, some officials purchased service credits (under terms identical to those offered to McGrath) for prior employment with the unions or elsewhere. *Id.* at 1147–50. When the state summarily evicted the officials from the Retirement System, they brought suit in this Court on Contract Clause grounds. *Id.* at 1150.

This Court held that as a matter of federal constitutional law, the officials had been parties to an implied in fact contract between themselves and the Retirement System. *Id.* at 1156. The Court reaches the same conclusion as to McGrath.

### a. Legislative Intent to Contract

 As a preliminary matter, the Court must determine whether, at the time McGrath bought his military service credit, the State of Rhode Island intended to enter into a contract with him. The Court recognizes that there is a strong presumption against interpreting statutes (such as §§ 45–21–53) as creating contractual rights. *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–466, 105 S.Ct. 1441, 1451, 84 L.Ed.2d. 432 (1985); *Hoffman*, 909 F.2d at 614. Nonetheless, if the statute and other indicia indicate that the legislature intended to bind itself contractually, then the presumption can be overcome. *State of Indiana ex. rel. Anderson v. Brand*, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938); *Brennan v. Kirby*, 529 A.2d 633 (R.I.1987). As the Court has stated:

> This is no small hurdle to vault. The party asserting the creation of a statutory contract must prove that the legislation is 'intended to create private contractual or vested rights' and not merely declaratory of 'a policy to be pursued until the legislature ... ordains otherwise.' *National R.R. Passenger Corp.*, 470 U.S. at 466, 105 S.Ct. at 1451.

*NEA–R.I.* at 1151–52. The most important indication of whether a statute constitutes a contractual offer is the language of the statute itself. *Dodge v. Board of Education*, 302 U.S. 74, 78, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937). If the statute creates express contractual rights, then the state is bound. In the absence of a clear statement, however, the language of the statute must adequately express actual intent on the part of the state to bind itself in order for the statute to be considered a contract. *National R.R. Passenger Corp.*, 470 U.S. at 465–67, 105 S.Ct. at 1451–52. Both the words and the effect of the statute must be examined. *United States Trust Co.*, 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14; *Brennan v. Kirby*, 529 A.2d at 637.

McGrath purchased his military service credit pursuant to R.I.Gen.Laws §§ 45–21–53 and 36–9–31. Neither statute creates an express legislative contract by its terms; while they state that military veterans "may purchase credit" in the Retirement System, they are silent as to any "offer," "acceptance," "consideration," or "contract." Still, when §§ 45–21–53 and 36–9–31 are read in conjunction with the other statutes governing the purchase and application of military credits, a legislative intent to convey certain rights and accept certain duties emerges.

For example, § 45–21–28 (1991), which applies to McGrath as a former municipal member, reads in part:

> **Refund of contributions on cessation of membership.—** ... Any member who is not eligible for the receipt of a service retirement allowance or any other benefit shall be entitled to a refund. The acceptance of a refund by a member shall effect a forfeiture by the member *of all rights in the system and all accrued service credits.* No member shall be deemed to have forfeited any of the member's accrued *service credits or other rights* in the system because of a change in employment from one participating municipality to another[.]

(Emphasis added.) Obviously, the General Assembly views members of the Retirement System as possessing certain "rights"—the definition of which is left unclear, although service credits are but a subset of them. Moreover, the linkage between service credits and "other rights" leads the Court to the reasonable conclusion that military service and probationary credits confer rights in the System, and that they are equal in stature to those gained by service.

The facts surrounding the 1992 amendment of § 45–21–16 add weight to the conclusion that the General Assembly intended to confer certain rights in the System on those who purchased military service credit. The 1991 amendment of § 36–10–9 provided that "a person who has ten (10) years service credit shall be vested." Section 45–21–16 was soon amended to read, "Provided, how-

ever, a person who has ten (10) years service credit on or before June 16, 1991 shall be vested." R.I.Gen.Laws § 45–21–16(b)(i) (Supp.1993). That vesting deadline was subsequently extended until December 31, 1992 by the Retirement Board. Implicit in the two provisions, and in the Retirement Board policy, is the State's acknowledgment that municipal employees who had purchased credits held rights which the State had to honor. Put simply, the purchase of military service credit conferred rights on the Retirement System members, and obligations on the State.

The indeterminacy of the rights, however, begs the question whether the General Assembly intended those rights to be *contractual*. Referring again to the Court's previous holding in *NEA–R.I.* that union officials who had paid to enroll in the Retirement System were parties to implied in fact contracts with the State, 890 F.Supp. at 1156, the Court now holds that the rights conferred on McGrath via his purchase of military service credit were contractual, and that the State intended them to be so.

■■■ McGrath argues, and the Court agrees, that modern pension jurisprudence treats the relationship between public employees and their retirement systems as an implied contract. In *NEA–R.I.*, the Court undertook a survey of the models developed by courts seeking to categorize state pension systems in the face of Contract Clause challenges. 890 F.Supp. at 1153–55. At one end of the spectrum lies the gratuity model, *see Pennie v. Reis*, 132 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426 (1889), which holds that pensions are a gift from the state. As such, they are subject to legislative modification and revision "without Contract Clause or common law contract consequences." *NEA–R.I.*, 890

F.Supp. at 1153. At the opposite end of the spectrum lies the pure contract model, typified by the Arizona Supreme Court's decision in *Yeazell v. Copins*, 98 Ariz. 109, 402 P.2d 541 (1965), which holds that a state employee's right to a pension vests on his first day of employment. "Any subsequent changes to the pension system [are] inappropriate unilateral modifications of the contract between the officer and the state." 890 F.Supp. at 1154. Between these two ideological extremes lie a variety of implied contract models, which seek to balance the interests of public employees and the needs of the state. Employees rely on their expectation of receiving a pension when making many of life's decisions; that expectation must not be defeated. At the same time, the state may occasionally find itself beset with financial burdens that imperil the very pension system its employees rely on. Therefore, courts must allow states to make reasonable modifications to their pension systems, should those changes be fiscally necessary. *Id.* at 1154. In conclusion, the Court wrote:

> The prevailing view nationally, as a matter of state law, is to reject both the gratuity and the inflexible contract models in favor of others that lie somewhere toward the center of the spectrum.

*Id.* at 1155.

The Court then noted that in June 1992 (the same year § 45–21–16 was amended) the Rhode Island Supreme Court had characterized the state pension system as comprising "elements of both the deferred compensation and contract theories." *Id.* at 1156 (quoting *In re Almeida*, 611 A.2d 1375, 1386 (R.I. 1992)). Both theories are, in truth, theories of implied contract; they differ only in the time at which an employee can assert his pension rights.[1] While the Court is not

---

1. Under the contract theory, pension rights vest immediately; under deferred compensation theory, they vest upon satisfaction of statutory eligibility requirements. *NEA–R.I.*, 890 F.Supp. at 1156. "Of course, the answer to that question has far-reaching effects, and the [*Almeida*] Court thus sought to avoid cementing the retirement system into a particular compartment." *Id.*

Even at this point, the question remains open. The Retirement Board argues that McGrath "claims a vested right in all benefits offered by

the Retirement System ... and specifically the benefits of R.I.Gen.Laws § 45–21–16 prior to its amendment." Defendant's Brief at 17. In the Board's view, such "benefits" are floating gratuities until a municipal employee satisfies the minimum vesting requirements—an argument in line with the deferred compensation model. But the Board mischaracterizes McGrath's claim.

McGrath's cause of action arises out of the alleged unconstitutional impairment of a contract he entered into with the state when he

bound by the determinations of the Rhode Island Supreme Court as to matters of federal constitutional law, *In re Almeida* adds support to the Court's determination that relations between participating state and municipal employees and the Retirement System are impliedly contractual.

It therefore follows that in 1991, when McGrath purchased his military service credit, the "rights" conferred on him were understood to be contractual. The General Assembly intended rights to be granted; those rights were presumptively contractual; the General Assembly therefore evinced an intention to contract.

### b. Formation of Contract

The Court must now consider whether McGrath's purchase of two and a half years of military service credit on April 15, 1991 formed a contract between himself and the Retirement System. For the reasons detailed below, the Court now holds that an implied in fact contract was created by the transaction.

First, the Retirement Board's grant of military service credit to McGrath pursuant to §§ 45–21–53 and 36–9–31 required a voluntary agreement between the parties. The Retirement System neither bestowed free credit on McGrath nor did it force him to buy it. Instead, it extended an offer which McGrath accepted, at considerable effort and expense. He informed the Retirement Board that he wished to purchase cred-

it; they calculated the price according to a statutory formula; he agreed to pay that sum. In classical contract terms, there was offer and acceptance resulting in a meeting of the minds.[2]

Second, McGrath provided consideration for the military credit he received. He paid $4,316.09 to the Retirement System for the sole purpose of gaining the two and a half years' credit. There was a bargained-for exchange, the terms of which were set by § 36–9–31. The Retirement System gained cash in the short term—which it might put to present purposes or invest—while McGrath expected to accelerate his retirement and then receive an augmented pension.

Viewing McGrath's purchase of military service credit through the lens of traditional contract law clarifies the issue of whether an implied in fact contract was formed. For an agreement to be enforceable under contract law, the parties must evince their objective intent to be bound. *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp.*, 641 A.2d 75, 79 (R.I.1994) (applying R.I. law). Such a showing may be made by one party's making an offer, and the other party's acceptance of it. *Smith v. Boyd*, 553 A.2d 131, 133 (R.I.1989).

Sections 45–21–53 and 36–9–31 conjoined to form an offer. According to the *Restatement*, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that

purchased his military service credit. He is not claiming that his pension rights vested at one time or another—in fact, all parties agree that they have not. McGrath seeks not the "benefits" of § 45–21–16; he seeks the benefits of his April 1991 bargain. His claim arises out of a specific exchange of money for military service credit, not out of his membership in the Retirement System.

Thus the question of when a municipal employee can bring a Contract Clause claim on the grounds of membership in the System alone is not before the Court. (It is clear, under either theory, that employees who have met the ten year contributory service minimum are vested.) The Court will therefore refrain from expressing any views on the matter.

2. At oral argument, the Retirement Board made much of the fact that McGrath's membership in the Retirement System was subject to the City of Cranston's continued participation in it. If

Cranston had withdrawn from the Retirement System prior to McGrath's vesting, then he would have lost whatever pension rights he had accrued or purchased. *See* R.I.Gen.Laws § 45–21–5 (1991) (allowing for the voluntary withdrawal of participating municipalities). In the Board's view, this fact disabled McGrath from contracting directly with the state. The fact remains, however, that McGrath *did* negotiate with, and purchase his credit from, the Retirement System; Cranston was minimally involved in the transaction. In contract terms, Cranston's continued involvement in the Retirement System functioned as an implied condition subsequent; Cranston's withdrawal would have excused the state's contractual obligations to McGrath. *See Restatement (Second) of Contracts*, § 230 ("Event That Terminates a Duty"). As Cranston never did so, the state may still be held to its bargain.

his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts*, § 24 (hereinafter *Restatement*). Section 36–9–31, applicable to McGrath via § 45–21–53, offered to sell military service credit to eligible municipal employees, provided they accepted the General Assembly's terms. The statute established the maximum amount of credit McGrath could purchase and the price, and dictated a schedule under which interest would be charged or not. On its face, § 36–9–31 framed the elements of the State's bargain and manifested a willingness to enter into it. McGrath was led to understand reasonably that he had only to agree to the terms and tender his money for the bargain to be struck.

The Retirement Board argues that § 36–9–31 fails to demonstrate an express legislative intent to contract, and no implied contract can be found. The Board cites *Hoffman v. Warwick*, 909 F.2d 608 (1st Cir.1990) for the proposition that absent clear contractual language, a statutory contract cannot be formed. Thus, whatever offer the Board made to McGrath was a gratuity, revocable at any time until his pension rights vested.

The Board's position requires a willfully narrow reading of *Hoffman*'s holding. The First Circuit stated that legislative intent to contract may be evinced in the language and *circumstances* of the statute; a court may look beyond the bare letters of the text. *Hoffman*, 909 F.2d at 614 (citing *U.S. Trust*, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92). Moreover, the *Hoffman* Court did not make new law; consideration of a statute's circumstances and other indicia have been part of Contract Clause inquiry since *Indiana ex. rel. Anderson v. Brand*, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938). Thus the Court may consider the mechanics of McGrath's purchase, his expectations, and the evidence that the General Assembly intended McGrath to be gaining rights in the Retirement System, in concluding that § 36–9–31 acted as a statutory offer.

Nevertheless, the Retirement Board argues that *Hoffman* supports the proposition that neither the Retirement Act (R.I.Gen. Laws §§ 36–8–1 to –10–38) nor any of it amendments creates contractual obligations on the part of the State. In *Hoffman*, the First Circuit upheld a lower court's dismissal of a Contract Clause challenge to the retroactive repeal of R.I.Gen.Laws § 30–21–3 for failure to state a claim. 909 F.2d at 610–11. Section 30–21–3, which had nothing to do with the Retirement System, granted enhanced employment seniority to war veterans who went to work for Rhode Island's municipalities. However, the statute was not enforced, and was repealed shortly after the named plaintiffs requested greater seniority. *Id.* at 611–12. The plaintiffs argued that § 30–21–3 "conferred an enhanced seniority status upon them" which became part of their employment contracts; the repeal of § 30–21–3 substantially impaired those contracts and thus violated the Contracts Clause. *Id.* at 614. The First Circuit failed to find that § 30–21–3 conferred contractual rights on the plaintiffs. The Court held that "[t]he language and circumstances of Section 30–21–3 do not suggest a legislative intent to create private contractual rights." *Id.*

The *Hoffman* decision can be distinguished on two factual grounds, the first relating to offer and acceptance, the second relating to consideration. First, § 30–21–3 hardly fell within the *Restatement*'s definition of an offer. It (technically) granted enhanced seniority to the plaintiffs without requiring any action on their part; no acceptance or agreement was asked for. In fact, the existence of § 30–21–3 was concealed from the veterans, *see id.* at 611, 614–15, effectively nullifying any possibility that it function as an offer. As the First Circuit noted, the municipalities failed completely "to extend . . . any rights whatsoever[.]" *Id.* at 614. McGrath, of course, was offered military service credit, and accepted it.

 Second, while McGrath paid $4,316.09 for his credit, the veterans in *Hoffman* would have been charged nothing. "Contracts implied in fact require the element of consideration to support them as is required in express contracts." *Hayes v. Plantations Steel Co.*, 438 A.2d 1091, 1094 (R.I.1982) (reflecting the majority position). The seniority benefits in *Hoffman* were a gift; recipients of gratuities have no right to bring Contract Clause claims. *NEA–R.I.*,

890 F.Supp. at 1159. In the present instance, McGrath tendered 25 percent of his first year's salary for his military credit.

The Retirement Board has argued that even if there was offer and acceptance, any implied contract between McGrath and the Retirement System must fail for want of consideration. The Board maintains that McGrath paid less than the full actuarial value of his military credit. This argument is misplaced: "[W]hether or not [a] contract *exists* is an entirely different question from whether a contract is *enforceable.*" *NEA–R.I.,* 890 F.Supp. at 1159 (emphasis in original). In determining whether or not a contract was formed, the Court will not look to the adequacy of consideration. *Restatement,* § 79. There was an exchange of money for military credit, on terms set by the General Assembly. McGrath's payment met the requirement of consideration.[3]

Therefore, the Court finds that McGrath's purchase of military service credit pursuant to §§ 45–21–53 and 36–9–31 formed an implied in fact contract between himself and the Retirement System.

### c. Terms of the Implied in Fact Contract

Contracts implied in fact generally have the same legal effect as express contracts. *A and B Const., Inc. v. Atlas Roofing and Skylight Co.,* 867 F.Supp. 100, 108 (D.R.I.1994). As with express contracts, the obligations in an implied contract arise from the intentions of the parties, *Bailey v. West,* 105 R.I. 61, 249 A.2d 414, 416 (1969); the Court looks to the parties' intentions in determining the terms of the implied contract. *Restatement,* § 5.

Reading the applicable statutes as expressive of the General Assembly's intent, and determining McGrath's intentions as demonstrated by the facts, it is clear that McGrath's implied contract had two principal, though unequal, terms. First, the purchase of military credit gave McGrath the right to an augmented pension. Had

McGrath retired after fulfilling the ten year total service requirement, his two and a half years' worth of military credit would have raised his monthly benefits by approximately 5%. While the percentage figure is unremarkable, the additional sums could have added up to a considerable amount over time.

The most important purpose behind the purchase of military credit is to maximize one's pension benefits; by adding two and half years to his service total, McGrath sought extra pension income for the rest of his life. His principal reward for military service would have been more money for himself and his family, year in and year out, to do with as he pleased. It is undisputed that this element of the bargain was unabridged by the amendment of § 45–21–16; had he met the ten year contributory service minimum, he would have retired with twelve and half years' credit.

The second term of McGrath's bargain underlies this action. In April 1992, the unamended § 45–21–16 permitted McGrath to apply his military credit towards vesting. Thus McGrath purchased the right to accelerate the date of his pension eligibility by the amount of his purchased credit. While the Retirement Board's application of § 45–21–16 allowed him to use his probationary credit, the disallowance of his military credit nullified this term of the contract.

Yet despite McGrath's protestations, the right to accelerate one's pension eligibility is ancillary to the main purpose of military credit, which is to increase one's pension payments. Consider the defeasible nature of the acceleration term: Under the prior total service calculation, military credit was most valuable on the day when the sum of the employee's purchase and service credit equaled the ten year minimum. On that day, the employee's rights vested. Presuming that the employee continued working, every following day diminished the value of the acceleration term. When the employee had

---

**3.** The Court notes that the Retirement System charged McGrath only slightly more for two and a half years' military credit ($4,316.09) than he contributed as a municipal member during his first two and a half years' service ($4,075.41).

Drawing all inferences in favor of McGrath, this Court is unwilling to say that the price charged for the military service credit was unconscionable *per se.*

accumulated ten years of contributory service, or if the military service credit was purchased after that point, the credit became useless as far as vesting was concerned. Yet no argument can be made that the employee's bargain had been destroyed—the purchased credit augmented the subsequent pension payments and the employee was rewarded in retirement for his military service. That was the core element of his bargain.

█ The Court notes that the statutory terms of McGrath's contract reserved to Rhode Island the right to make reasonable modifications to it. R.I.Gen.Laws § 45-21-47 (1991) reads:

**Reserved power to amend or repeal—[.]** The right to amend, alter, or repeal this chapter at any time or from time to time is expressly reserved[.]

While the Contract Clause establishes an upper limit on possible alterations, *see* section III.A.2, *infra,* the Court concludes that McGrath's contract had, in effect, a reasonable modification clause.

### 2. Whether McGrath's Implied Contract Was Substantially Impaired

Having concluded that McGrath was party to an implied contract with the Retirement System, the Court must now determine, first, whether that contractual relationship was impaired and, second, whether the impairment was substantial. *General Motors Corp. v. Romein,* 503 U.S. at 186, 112 S.Ct. at 1109. Only if the impairment is substantial will the Court continue its inquiry, *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704, and require the state to justify the impairment as "reasonable and necessary to serve an important government purpose." *United States Trust,* 431 U.S. at 25, 97 S.Ct. at 1519 (1977). A finding of insubstantiality is fatal to McGrath's claim under the Contract Clause.

█ The question of whether the contract was impaired has already been answered in the affirmative. The amendment of § 45-21-16 prevented McGrath from applying his

military credit towards vesting, depriving him of that element of his bargain.

█ The more nettlesome question is whether that deprivation amounted to a substantial impairment of McGrath's overall contract. For the reasons stated below, the Court concludes that the 1992 amendment of § 45-21-16, applying the new ten year contributory service minimum to McGrath, insubstantially impaired the implied contract formed by his purchase of military service credit under §§ 45-21-53 and 36-9-31.

█ Under the Contract Clause, the unilateral modification of state contracts is constitutionally permissible, although such alterations would be barred by traditional contract law. *NEA–R.I.,* 890 F.Supp. at 1162. (Indeed, the Court is bound to uphold even substantial impairments, provided they survive the intermediate scrutiny mandated by *United States Trust* and its progeny.) As an initial matter, the level of impairment establishes whether the legislation is presumptively constitutional or not. "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245, 98 S.Ct. 2716, 2722–23, 57 L.Ed.2d 727 (1978) (footnotes omitted); *see also Castellano v. Board of Trustees,* 937 F.2d 752, 757 (2nd Cir.1991) (same). For any "alteration" below "severe"—in truth, any modification below substantial impairment—the "hurdle" is small. The Court must uphold minimal changes in statutory contracts as a matter of law and policy, in order to safeguard the state's ability to develop new strategies and programs.

█ Some state supreme courts have expressed their legislatures' power to alter pension contracts insubstantially by implying a reasonable modification term into the contracts.[4] *See, e.g. Allen v. City of Long*

---

**4.** By implying a reasonable modification term into implied pension contracts, state courts have also shielded their legislatures from breach of contract suits brought by plan members. *NEA–*

*R.I.,* 890 F.Supp. at 1162. As McGrath has not raised a breach of contract claim, the Court need not consider the effects of § 45-21-47.

*Beach,* 45 Cal.2d 128, 287 P.2d 765 (Cal.1955); *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320 (Mass.1973). The Ninth Circuit elegantly expressed the relationship between reasonable modification terms and Contract Clause inquiry in *State of Nevada Employees Assoc., Inc. v. Keating,* 903 F.2d 1223 (9th Cir.1990). In *Keating,* the Court faced the question of whether a legislative alteration of the state pension system, affecting state employees' freedom to withdraw their pension contributions without penalty, constituted a violation of the Contract Clause. *Id.* at 1224–25. Although the Court ultimately found the legislation unconstitutional, *id.* at 1228, the Court stated that the Nevada Supreme Court had held that "public employees' contractual pension rights are subject to reasonable modification. If the 1983 amendments constituted a reasonable modification of the pension plan, then they would not create a substantial impairment of contractual obligations." *Id.* at 1227 (citation omitted). "Reasonable modification" can thus be viewed as an alteration not rising to the level of "substantial" or "severe," and therefore not triggering the "careful examination" envisioned by *Spannaus.* The Contract Clause thus reserves to Rhode Island the power to make reasonable, insubstantial modifications to its pension contracts, and more specifically, to the contract it entered into with McGrath.

Whether the 1992 amendment of § 45–21–16 may be termed a reasonable modification of McGrath's implied contract, or a substantial impairment of it, is the question the Court now faces. "The Supreme Court, however, has provided little specific guidance as to what constitutes a 'substantial' contract impairment." *Baltimore Tchrs. Un. v. Mayor, Etc., of Baltimore,* 6 F.3d 1012, 1017 (4th Cir.1993). While "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment," *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704, a finding of "technical impairment" is insufficient. *United States Trust,* 431 U.S. at 21, 97 S.Ct. at 1517. When the impairments at issue have stood between these two endpoints, the Court has looked to certain factors, none individually determinative, in reaching its decisions. *City of Charleston v.*

*Public Serv. Com'n of W.Va.,* 57 F.3d 385, 392–395 (4th Cir.1995) *petition for cert. filed,* 64 U.S.L.W. 3167 (U.S. Sep. 6, 1995) (No. 95–375) (cataloguing the factors considered).

The Supreme Court's primary criteria has been the degree to which the plaintiff reasonably relied on the impaired term, *Spannaus,* 438 U.S. at 245–46, 98 S.Ct. at 2723, *City of Charleston,* 57 F.3d at 392, or was "substantially induced" by it in forming the contract. *City of El Paso v. Simmons,* 379 U.S. 497, 514, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965). Drawing all inferences in favor of McGrath, it is clear that he intended to retire in November 1993 or shortly thereafter, and that he relied on his right to accelerated vesting in planning to do so. Moreover, the availability of early retirement was an obvious inducement to buy the military credit in April 1991.

Nevertheless, when the Court draws all inferences in favor of the Retirement Board, McGrath's reliance on his acceleration right appears to have been unreasonable. When considering reasonable reliance, the Supreme Court has asked whether the original contract "explicitly or implicitly" indicated that it was subject to impairment by legislative action or regulation. *City of Charleston,* 57 F.3d at 392–93. Section 45–21–47 did exactly that, as a blanket proposition. It did not explicitly indicate that the ten year total service minimum was subject to legislative change, but its general reservation of legislative power put McGrath on notice that his contractual terms were not inscribed in granite. Moreover, the power of states to alter their service minimums is implicit in the statutes, as a matter of policy.

When the Rhode Island General Assembly amended §§ 36–10–9 and 45–21–16, it was addressing a problem common to every state in the Union: the fiscal strain of supporting pensioned state and municipal employees who would live longer than ever before. Rhode Island has the right to ask its state and municipal employees for ten years of actual, contributory service before they are rewarded with lifetime pensions, just as other states have succeeded in raising their minimum retirement ages in order to length-

en the periods of service required of their employees. *See Pineman v. Oechslin,* 195 Conn. 405, 488 A.2d 803 (1985) (upholding the raising of minimum retirement age for female state employees on grounds that no statutory contract formed by prior statute); *Spiller v. State,* 627 A.2d 513 (Me.1993) (upholding a change in minimum retirement age for state employees on grounds that no statutory contract formed and amendment did not violate due process). Even though the Court *has* found contract formation, this writer reads *Pineman* and *Spiller* as representing a recent judicial tendency to uphold changes in minimum service—through raised retirement ages or other means—as constitutionally permissible.

Here, § 45–21–47 permitted the State to make reasonable modifications to its contracts; *Pineman* and *Spiller* are illustrative of the reasonableness of asking McGrath to work another two years. By April 1991, McGrath should have had lowered his expectations that the total service requirement would remain in force; that it could be changed was implicit in its nature.

Moreover, however much McGrath relied on the total service minimum, that reliance became impossible after June 16, 1991, a mere two months after his purchase. On that day, § 36–10–9 was amended; although the Retirement Board later interpreted the statute as *not* amending § 45–21–16 *sub silentio,* a reasonable reading of the amended § 36–10–9 supports that conclusion. James M. Reilly, the assistant director of the Retirement System, read § 36–10–9 as amending § 45–21–16, as did enough other people that the amendment of § 45–21–16 in 1992 and the Retirement Board's subsequent actions were driven largely by the need to dispel the confusion. For present purposes, it is enough to say that after June 16, 1991, McGrath was on notice that § 45–21–16 had either been amended or would be, and that he could no longer rely on the statute in calculating his retirement eligibility. (Confusion is one thing, reliance another.)

Two other factors demand consideration with regard to reliance.[5] First, the Supreme Court has asked whether a contractual promise was abolished or "merely modified." *United States Trust,* 431 U.S. at 19, 97 S.Ct. at 1516. Here, the facts weigh in McGrath's favor: the second term of his implied contract, the acceleration right, evaporated with the amendment of § 45–21–16. But the Supreme Court has also asked if the promise was the "central undertaking" or the "primary consideration" of the contracting parties. *City of El Paso,* 379 U.S. at 514, 85 S.Ct. at 586. The Court has already found that the primary purpose of the military credit was to augment McGrath's pension, and that the amendment of § 45–21–16 did not affect this element of the bargain. (The Court also notes, in passing, that the Retirement Board's extension of the deadline for vesting under the total service calculation was a reasonable attempt to preserve the acceleration rights of many employees, though McGrath was not helped.) Therefore, while McGrath did lose an element of his bargain, it was ancillary to the main purpose, minimizing the harm.

Balancing these factors, the Court holds that whatever reliance McGrath placed on the ten year total service minimum was unreasonable, as the statute was implicitly subject to change; McGrath was on notice of its amendment just two months after he bought the credit; and the amendment affected a secondary purpose, leaving his right to an augmented pension intact.

It follows that under the Supreme Court's analysis, the amendment of § 45–21–16 did not rise to the level of a substantial impairment of McGrath's implied contract. It was a reasonable modification, not subject to the heightened scrutiny demanded by *United States Trust* and *Spannaus.* McGrath lost the substance of his bargain when he terminated his employment on April 28, 1994, two years early, not when the statute was changed. The Court's inquiry is thus at end; it is the duty of the Court to uphold the amendment of § 45–21–16 in 1992 as consti-

5. The Supreme Court has also considered the extent of prior regulation of the industry in which the contract was formed, in order to mea- sure the parties' expectations. *City of Charleston,* 57 F.3d at 393. As this factor pertains to private parties, the Court will not address it.

tutional under the Contract Clause. Summary judgment on the contract clause claim is granted to the defendant.

## B. The Equal Protection Clause

 McGrath's second cause of action alleges that the General Assembly's amendment of § 45–21–16, and the Retirement Board's subsequent application of it, denied him the equal protection of the laws as guaranteed to him by the Fourteenth Amendment to the United States Constitution. He raises two nearly identical claims: First, that the amended § 45–21–16 irrationally differentiates between persons who had purchased ten years' credit prior to June 16, 1991, and whose rights had therefore vested, § 45–21–16(b)(i), and persons such as McGrath who had purchased three years but who did not have ten years' total service on that date. Second, he argues that the Retirement Board's decision to extend the vesting deadline under the total service calculation to December 31, 1992, irrationally discriminated between persons who had accumulated ten years' purchase and service credits prior to that date, and persons like McGrath who would have met the requirement afterwards. He seeks declaratory and other relief pursuant to 42 U.S.C. § 1983.

 The Equal Protection Clause reads: "No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Yet legislative classifications are part and parcel of ordinary governance, and the Constitution has never been read to forbid a state from distinguishing among its citizenry. Where, as here, the state does not classify persons along suspect or quasi-suspect lines, or impinge upon fundamental rights, the action must be rationally related to a legitimate government purpose to survive a challenge under the Equal Protection Clause. *See, e.g., Federal Communications Comm'n. v. Beach Communications, Inc.,* 508 U.S. 307, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); *Hoffman,* 909 F.2d at 621–22; *Clayton v. Town of West Warwick,* 898 F.Supp. 62 (D.R.I.1995). The distinction drawn by § 45–21–16(b)(i) between those who had vested under the total service calculation and

those who had not, and the Retirement Board's extension of the deadline, need only survive rational basis review to defeat McGrath's claim. "Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Communications,* 508 U.S. at ——, 113 S.Ct. at 2102.

 Members of the Rhode Island Retirement System fall into three distinct categories: vested, vested subject to divestment, and not vested. Retired employees who have met the eligibility criteria and are receiving pensions can be said to be fully vested in the System. State and municipal employees who have fulfilled the minimum service requirements, but continue to work, have pension rights that are vested subject to divestment. They have a legal right to their pension benefits upon attaining age 58 or upon retirement, whichever is later. However, malfeasance on their part, or other possible events, will divest the employees of their rights. *See In re Almeida,* 611 A.2d 1375, 1386 (R.I. 1992) ("Although pension rights are to vest once the requirements of the pension statute are met, such vesting is subject to divestment for actions committed during tenure in office, whether found out while in office or later, or later conduct, depending on its ramifications.") And third, there are those employees, such as McGrath, who haven't worked long enough for their pension rights to vest under §§ 36–10–9 and 45–21–16.

The reason for the General Assembly's passage of § 45–21–16(b)(i), exempting municipal employees with more than ten years total service on June 16, 1991 from the new contributory service minimum, is self-evident. The legislature was distinguishing between employees in the first two categories, whose pension rights had already vested, and those whose rights had not. The distinction drawn by the exemption was a rational means of preserving the rights of the Retirement System's vested members, whether they were retired or still employed. (The General Assembly was also honoring the

state's contractual obligations to some purchasers of military credit.)

Regarding the Retirement Board's decision to extend the vesting deadline to December 31, 1992, it is undisputed that the piecemeal amendment of §§ 36–10–9 and 45–21–16 in 1991 and 1992 left the Board unsure whether to apply the old total service minimum or the new contributory service minimum to municipal employees. While the additional eighteen month grace period flew in the face of the amended § 45–21–16(b)(i), it was intended to resolve the confusion caused by the General Assembly's sloppiness. The logical solution was to extend the deadline until January 1, 1993, the day the amended § 45–21–16 went into effect; the grace period was a rational means of reconciling the two statutes, a perfectly legitimate aim.

Therefore, both the General Assembly's creation of the § 45–21–16(b)(i) exemption and the Retirement Board's extension of the vesting deadline withstand rational basis review under the Equal Protection Clause. McGrath's claims are without merit as a matter of law. Summary judgment is granted to the defendant on the equal protection claim.

## C. The Due Process and Takings Clauses

McGrath's third cause of action, as set forth in his First Amended Complaint, avers that McGrath's "property, his contributions to the Rhode Island State Employees' Retirement System and his purchased service credits, have been lost" by virtue of § 45–21–16's amendment and his subsequent ineligibility for a pension. Plaintiff's First Amended Complaint at 5. He claims violations of the Fifth and Fourteenth Amendments to the United States Constitution, and seeks declaratory and other relief pursuant to 42 U.S.C. § 1983.

 McGrath neglects to develop his third cause of action anywhere in his memoranda (nor did he address it at oral argument), leaving the Court to wrestle with the summary language he provides in his Complaint. Nevertheless, the Court finds that McGrath's third cause of action implicates both substantive due process and the Takings Clause, and the Court will treat the Complaint as raising those claims. However, the Court will only address the question of whether McGrath's constitutional rights were abrogated by the reasonable modification of his contract. R.I.Gen.Laws § 45–21–28 (1991) provides for the refund of members' contributions upon cessation of membership, and it is the understanding of this Court that McGrath's contributions will be returned to him when this matter is resolved. Any claims arising out of his contributions alone are therefore premature.

### 1. The Due Process Clause

 McGrath's Due Process claim proceeds under the Fourteenth Amendment and 42 U.S.C. § 1983. The clause, which mandates that no "State [shall] deprive any person of life, liberty, or property without due process of law," U.S. Const. amend. XIV, shields property interests from arbitrary state action. *NEA–R.I.*, 890 F.Supp. at 1164. McGrath's claim arises out of the possibility that by disallowing the application of McGrath's military credit toward vesting, the General Assembly retroactively extinguished a contract right, abridging McGrath's right to due process of law. Doctrinally, this is a substantive due process claim. *Id.* at 1164 n. 11.

In *West v. Town of Bristol*, 712 F.Supp. 269 (D.R.I.1989), this Court wrote: "The predicate to a property interest ... is a legitimate claim of entitlement under state law.... Denial of such an entitlement creates the basis for a property-interest due process claim." *Id.* at 275 (citations omitted). The Court has already found that McGrath was party to an implied in fact contract with the Retirement Board; clearly, contractual rights are property interests under the Due Process Clause. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). McGrath's contract rights thus merit constitutional protection.

The Court has already determined that the amendment of § 45–21–16 worked a reasonable modification of McGrath's implied in fact contract. The principal purpose of the contract was preserved; the loss of the accelera-

tion right was one twig out of the bundle. Still, even if McGrath were to argue that the Due Process Clause barred reasonable modifications, his attack on the constitutionality of § 45–21–16 would fail.

■ Under the Supreme Court's test in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), retroactive legislative is constitutional under the Due Process Clause so long as it effects a legitimate legislative purpose by a rational means. *Id.* at 730, 104 S.Ct. at 2718. *See Lieberman–Sack v. Harvard Community Health Plan of New England*, 882 F.Supp. 249 (D.R.I.1995). Although "[t]he retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process," *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976), "that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guaranty Corp.*, 467 U.S. at 730, 104 S.Ct. at 2718. Despite the danger retroactive legislation poses to settled expectations—a hazard greater than that posed by prospective legislation, *see General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328—"legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Pension Benefit Guaranty*, 467 U.S. at 730, 104 S.Ct. at 2718 (citations omitted).

Here, the amendment of § 45–21–16, substituting the new contributory service minimum for the old total service minimum, guaranteed that Rhode Island and its municipalities would receive a decade's actual service (and monetary contributions) before rewarding employees with lifetime pension benefits. When the Retirement Board allowed probationary credit to be applied towards the contributory service minimum, it underscored the State's desire to enjoy the fruits of its employees' labors before they, in turn, reaped their pensions. The Court's determination that the amended § 45–21–16 reasonably modified McGrath's contract speaks to the Due Process claim as well as the Contracts Clause; modifying McGrath's contract was

an eminently reasonable means of pursuing a legitimate governmental aim.

For these reasons, the amendment of § 45–21–16 passes muster under the Due Process Clause, and McGrath's claim is without merit as a matter of law. Summary judgment on the due process claim is granted to the defendant.

**2. The Takings Clause**

■ The Takings component of McGrath's third cause of action arises under the Fifth Amendment, applicable to Rhode Island through the Fourteenth Amendment and 42 U.S.C. § 1983. McGrath's assertion that his property was "lost" leads the Court to consider whether the nullification of McGrath's acceleration right amounted to a taking of property without just compensation. For the reasons set forth below, the Court concludes that no such taking occurred.

■ The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Applicable to states through the Fourteenth Amendment, *see, e.g. Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980), the Clause guards against the state's imposing society's costs on its citizens when their property is taken and put to public use by the government.

■ Contract rights are as much private property under the Takings Clause as they are under the Due Process Clause. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984); *United States Trust*, 431 U.S. at 19 n. 16, 97 S.Ct. at 1516 n. 16 ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."). McGrath's contractual acceleration right thus falls under the aegis of the Clause—even though the impact of the amended § 45–21–16 must be gauged against the overall contract, which was reasonably modified.

■ In evaluating whether the amendment of § 45–21–16 constituted a taking of

McGrath's property without just compensation, the Court will look to the three significant factors set forth in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), and its progeny. "The [Supreme] Court has repeatedly used the significant factors enunciated in *Penn Central* to analyze takings claims: '(1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; (3) "the character of the governmental action." '" *Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962, 974 (1st Cir.1993) (quoting *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986)).

McGrath has not demonstrated that § 45–21–16, as amended, had any economic impact on him whatsoever. The loss of his pension must be ascribed to his own actions; the Court's finding of reasonable modification prevents McGrath from arguing that § 45–21–16 cost him his pension benefits. In a similar vein, he has not presented any evidence of what economic harm (or opportunity costs) he would have suffered by working for another two years.

Nor can a reasonable contract modification be considered a significant interference with McGrath's investment-backed expectations. The Court will not replicate the analysis it performed when determining the level of contractual impairment, though its conclusions apply equally well here. McGrath's right to an augmented pension was carefully preserved, and the loss of his acceleration right was a minimal impairment of his implied contract. A finding of reasonable, permissible modification precludes the Court from holding that McGrath's expectations were significantly interfered with.

The character of the General Assembly's actions was similarly benign. Section 45–21–47 reserved the State's power to alter McGrath's contract, provided the amendments did not run afoul of the Contract Clause. The changes wrought by the amendment. of § 45–21–16 impaired his bargain insubstantially, in exercise of the legisla-

ture's power under the Constitution and § 45–21–47. Thus, the disallowance of McGrath's application of his military credit towards vesting cannot be termed so intrusive as to be a taking.

The Court therefore finds that the amendment of § 45–21–16 did not result in a taking of McGrath's private property without just compensation. Summary judgment is granted to the defendant on the Takings Clause claim.

## IV. Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment on the four constitutional claims asserted in the Complaint is denied, and defendant's cross motion for summary judgment on all those claims is granted. The Clerk shall enter judgment for defendant forthwith.

It is so ordered.